Argued and submitted April 15, reversed and remanded with instructions on appeal; affirmed on cross-appeal June 8, petition for review allowed September 27, 1994
(320 Or 270)

Mary A. GREIST,
as Personal Representative of
the Estate of Peter Maurice Greist, Deceased,
*Appellant - Cross-Respondent,*

*v.*

Nicky Don PHILLIPS
and Lightning Transportation, Inc.,
a Tennessee corporation,
*Respondents - Cross-Appellants.*

Nicky Don PHILLIPS
and Lightning Transportation, Inc.,
a Tennessee corporation,
*Third-Party Plaintiffs-Respondents -
Cross-Appellants,*

*v.*

Elizabeth B. TRIPP,
*Third-Party Defendant -
Cross-Respondent,*

*and*

Mary A. GREIST,
individually,
*Third-Party Defendant-Appellant -
Cross-Respondent.*

(90-1879-L-1; CA A76287)

875 P2d 1199

Kathryn H. Clarke argued the cause for appellant - cross-respondent. With her on the briefs were Maureen Leonard and Robert A. Berst.

Hugh B. Collins and Ridgway K. Foley, Jr., argued the cause for respondents - cross-appellants. With them on the briefs were M. Elizabeth Duncan and Foley & Duncan, P.C.

Daniel L. Harris argued the cause for third-party defendant - cross-respondent and joined in the appellants' reply brief and answering brief on cross-appeal.

Adam Kimmell filed an *amicus curiae* brief.

Before Rossman, Presiding Judge, and De Muniz and Leeson, Judges.

De MUNIZ, J.

## De MUNIZ, J.

Plaintiff, the personal representative of her son's estate, brought this action for wrongful death. On June 14, 1989, plaintiff, her son and Tripp, aunt of the decedent, were returning to Oregon from California over the Siskiyou Pass in a Volkswagen Vanagon. Defendant Phillips was also travelling north over the pass, driving a five-axle truck and trailer owned by defendant Lightning Transportation, Inc. The truck and trailer had a gross weight of more than 75,000 pounds. The truck had bad brakes.[1] About 4:30 p.m., as Phillips was descending from the pass, the truck lost its brakes. Phillips moved into the passing lane, and, about six miles below the crest of the summit, rear-ended plaintiff's van. The van was propelled forward and overturned, skidding to a stop 595 feet from the point of impact. The truck was unable to stop for almost three miles. The decedent, who was 10 months old, was killed when he was thrown out of the van.

In this action, plaintiff sought compensation for the parents' loss of their child's society and companionship and for pecuniary loss to the decedent's estate. Defendants then filed a third-party action against Tripp and plaintiff, individually, and Tripp counterclaimed against defendants for damages for personal injuries.

The jury returned a verdict finding defendants solely at fault for decedent's death. It awarded plaintiff $100,000 for economic damages and $750,000 to each surviving parent. The trial court then applied ORS 18.560, holding that the statute imposed a single limit of $500,000 for noneconomic damages. It reduced plaintiffs' noneconomic damage award from $1,500,000 to $500,000. The jury found Tripp five percent at fault and awarded her $29,323 for economic damages and $50,000 for noneconomic damages. On plaintiff's appeal, we reverse and remand. On defendants' cross-appeal, we affirm.

---

[1] There was evidence that seven of ten brakes were out of adjustment and another was contaminated with oil. Phillips testified that, two days before the accident, he had trouble keeping the truck under control due to the brakes, which were smoking. He also testified that he had adjusted his brakes at a truck stop before going over the pass. However, there was testimony of an Oregon state truck inspector and expert witnesses that all four brake shoes on the trailer were so far out of adjustment that they were not making contact with the brake drum.

We begin with the cross-appeal. Defendants first assign error to the trial court's refusal to give their requested instruction regarding plaintiff's statutory duty to use a child restraint seat. ORS 811.210 makes it an offense for a person to operate a motor vehicle while any child under one year of age is not secured with a child safety system.

Defendants presented evidence that plaintiff's van was equipped with a child restraint device in good working order, but that decedent was not in the device. After the accident, the safety seat was intact and undamaged. A passenger in a vehicle that had followed plaintiff's van for several miles testified that he had observed a "little person romping around" in the back of the van. There was testimony that, if decedent had been properly fastened in the safety seat, he would not have been ejected from the car and would not have been killed.

Plaintiff's evidence was that decedent had been in his car seat for most of the journey, but, shortly before the accident, Tripp, who was sitting with decedent in the back seat, had taken him from the seat because he had become fussy. Tripp did not consult plaintiff before doing so. Tripp claimed that she was holding decedent on her lap when the collision occurred.

Defendants argue that the trial court's refusal to give their requested instruction[2] deprived them of a "major theme" of their case, i.e., that plaintiff's failure to use the

---

[2] Defendant's requested instruction read:

"The law requires that a person who drives a motor vehicle on the highways of Oregon in which there is a child passenger under the age of 12 months, must see to it that the child is properly secured with a child safety system that is designed to safeguard children of 40 pounds or less.

"The law placed on [plaintiff] as driver of the vehicle in which the decedent was a passenger, the obligation and duty to have had the deceased child properly secured with a child safety system at the time of the accident. Her failure to have the child so secured was a violation of the statute."

The court instructed the jury:

"It is for you to decide whether a reasonably prudent person under the circumstances then existing would have kept the child in a child safety device or restraint. If a reasonably prudent person would have kept the child in a child safety device or restraint, then it was also the common law obligation of [plaintiff] to so protect and guard the child."

Defendants did not object to the substance of that instruction.

required and available child restraint seat constituted negligence *per se,* which caused decedent's fatal injuries. However, the version of ORS 811.210(3) in effect when the accident occurred and when the action was filed provided:

> "A violation of this section shall not be considered under any circumstances to be negligence nor shall evidence of such a violation be admissible in any civil action."

On November 6, 1990, the voters approved an initiative measure that required adults, as well as children, to use seat belts and eliminated *former* ORS 811.210(3). The new law became effective on December 6, 1990. Trial here began in June, 1992. Defendants contend that the statute in effect at the time of trial controls.

■ The new law did not contain a retroactive provision, *see Whipple v. Howser,* 291 Or 475, 632 P2d 782 (1981), and the parties argue that application of the new law depends on whether it is procedural or substantive. Changes in law that affect substantive rights are not applied retroactively, but procedural changes can be. *Joseph v. Lowery,* 261 Or 545, 547, 495 P2d 273 (1972). Defendants argue that the change in ORS 811.210 was nothing more than a change in a rule of evidence and, therefore, that the change was procedural.

■ We agree with plaintiff that, although at first glance the statutory change might appear to be procedural, it is not. Defendants' requested instruction told the jury that plaintiff was negligent for violating ORS 811.210. That use of the statute was precisely what *former* subsection (3) prohibited.

In a situation analogous to the statutory change here, the Supreme Court refused to apply the new law of comparative negligence to behavior that predated the law:

> "[I]n the absence of an indication to the contrary, legislative acts should not be construed in a manner which changes legal rights and responsibilities arising out of transactions which occur prior to the passage of such acts." *Joseph v. Lowery, supra,* 261 Or at 551.

The 1990 repeal of *former* ORS 811.210(3) changed the rights and responsibilities of drivers in terms of their potential civil liability. The trial court did not err in refusing to give defendants' requested instruction.

Defendants next assign error to the court's refusal to withdraw from the jury two allegations of negligence that were based on two federal regulations: "lack of a working speedometer" and "the 70-hour rule."[3] Federal law requires a commercial truck to have an operating speedometer at all times. 49 CFR § 393.82. It also prohibits a truck driver from being on duty for more than 70 hours in any period of eight consecutive days. 49 CFR § 395.3.

■    Defendants do not dispute that a statute or rule is relevant to establish the standard of care owed by defendants. *Hansen v. Abrasive Engineering and Manufacturing*, 317 Or 378, 386, 856 P2d 625 (1993); *Shahtout v. Emco Garbage Co.*, 298 Or 598, 601, 695 P2d 897 (1985). The gist of their argument, however, is that, even where a plaintiff invokes a violation of a statute or rule to establish a breach of the general duty of due care, there must be "independent proof" that the violation caused the injury. They contend that plaintiff failed to prove that causal connection here.

■    The defendant in *Faber v. Asplundh Tree Expert Co.*, 106 Or App 601, 810 P2d 384, *rev den* 312 Or 80 (1991), made a similar argument. There, the plaintiffs sought damages for losses to their tree crops after the defendant applied herbicides to a right-of-way that was adjacent to the plaintiffs' tree nursery. The defendant assigned error to the trial court's admitting into evidence labels from herbicide containers. Its position was that

"the labels were only conditionally relevant and that no evidence was offered to connect them to the conditional fact. OEC 104(2). Defendant also contends that the evidence was confusing and misleading. The thesis of defendant's arguments is that, although the labels may have been probative of negligence, there was no showing that defendant's failure to follow the labels was a cause of damage. Defendant explains:

" 'The trial court's example of the drunk driver is, in fact, an example of *conditionally* relevant evidence. Evidence of the driver's intoxication * * * is received only because the court expects evidence that the intoxication was a cause of the injury. Admittedly, evidence of driving while intoxicated proves negligence. Nevertheless, the

---

[3] The court denied defendants' motions to withdraw the allegations and their requested instructions withdrawing the allegations.

evidence is nothing more than conditionally relevant until there is additional evidence to support a finding that the negligence was a cause of the rear-end accident.

" 'Here, the situation is much the same. The herbicide labels could have been received subject to the condition the plaintiffs later prove that a violation of the labels' directives caused [the plaintiffs'] damage.' (Emphasis defendant's.)" 106 Or App at 607.

We rejected the defendant's argument:

"That analogy demonstrates the opposite of the proposition that defendant would have us derive. The ultimate relevance of the driver's intoxication in the example does not depend on a showing that *intoxication* caused injury; it turns on a showing that the *negligence* that the intoxication tends to prove was causal. Similarly, here, the labels support a finding of negligence, and the negligence was shown by other evidence to be the cause of injury. Defendant essentially posits that every underlying fact from which negligence can be inferred, as distinct from the negligence itself, must have a direct causal link with the harm in order for a fact finder to consider it. The argument is self refuting." 106 Or App at 608. (Emphasis in original.)

Likewise here, the allegations that defendants failed to have a working speedometer and violated the 70-hour rule do not have to have a direct causal link with the harm in order for the jury to consider them.

Defendants argue, however, that the speedometer has no relation to the accident, because the truck tachometer continued to work properly. Defendants point to Phillips' testimony that a truck driver knows the truck's speed, within three or four miles an hour, by looking at the tachometer and that Phillips was thoroughly familiar with the relationship between the tachometer and speedometer readings on this particular truck. Phillips also testified that, when he moved into the passing lane to pass two trucks, he saw that his trailer brakes were smoking. It was at that point that he believed he "was in trouble," as far as his brakes were concerned, and that he tried to avert any accident by flashing the truck lights and sounding the horn. Defendants contend that Phillips' testimony shows that a working speedometer would not have made any difference in the events that occurred.

██ Defendants have viewed the evidence most favorably to themselves. On an appeal of the denial of motions to withdraw allegations from the jury, we consider all of the evidence, and the inferences that may be drawn from it, in the light most favorable to the plaintiff. *Wagner v. Kaiser Foundation Hospitals*, 285 Or 81, 84, 589 P2d 1106 (1979). Although at trial Phillips did claim that he could estimate his speed by the tachometer, on two occasions in the hours immediately after the collision, he told state police officers that he did not know how fast he was going because his speedometer did not work. Furthermore, speed was the cause of the loss of the truck's remaining operative brakes, and, when the accident occurred, the truck had no working brakes.

It is self-evident that a working speedometer allows a driver to conform the speed of a vehicle to posted speed limits. Here, the posted maximum safe speed for trucks beginning the descent from the pass was 18 miles per hour for trucks the size and weight of defendants' truck. There was evidence that the truck was travelling 40 to 45 miles per hour within two to three miles of the crest of the hill. Plaintiff's expert witness, a traffic engineer who participated in the federal project that set the speed limit on the Siskiyou Pass, testified that a heavily-loaded truck like defendants', even one with excellent brakes, must drastically reduce its speed in accordance with the posted limit, or risk losing the brakes. He also testified that the limits were set in anticipation that trucks would have a 20 to 30 percent reduction in braking efficiency. Thus, the speed limit was set so that even trucks with brakes out of adjustment could still safely negotiate the descent if they complied with the posted speed. In short, there was evidence to refute defendants' claim that the speedometer was unrelated to the accident. The jury could reasonably conclude that a working speedometer would have alerted Phillips sooner and more effectively than a tachometer, that he was travelling at an excessive and dangerous speed and that, if he had been traveling at the posted speed, he could have brought the truck under control with the remaining operative brakes.

██ The same is true of the 70-hour rule, which is designed to prevent accident due to fatigue. *See Starrett v. Bruce*, 391 F2d 320 (10th Cir), *cert den* 393 US 971 (1968).

Defendants argue that the jury could not infer from a violation of that rule that fatigue caused Phillips to start his descent at too high a speed. They contend that, for there to be a causal connection between the accident and the 70-hour rule, the jury would have to hypothesize that defendants' truck lost its brakes because Phillips violated the rule.

Safety regulations are standards deemed pertinent to protecting the public. *See Hanson v. Abrasive Engineering and Manufacturing, supra,* 317 Or at 394 (Gillette, J., concurring). Moreover, as noted above, the rule was relevant as to whether defendants met the appropriate standard of care. Defendants had the opportunity to make their case that violation of the rule had no bearing on the accident. They presented evidence of the number of hours that Phillips had worked over the preceding days, that he had slept 10 hours the night before the accident and that he had spent the morning of the accident at a truck wash.

However, there was also the evidence that: Phillips made a speeding descent in the face of a posted 18-mile per hour speed limit; he was aware that he had bad brakes but chose to continue driving; he knew that the truck escape ramps were closed and that the truck was not designed with an engine brake, because it was not customarily used for mountain driving; he knew that the truck was carrying almost a maximum load and had no speedometer; and he was not familiar with the mountain passes of Oregon. Furthermore, there was evidence that, when Phillips realized soon after cresting the mountain that he was having brake problems and could not maintain sufficient distance between himself and the truck ahead, he chose to pass the truck and shift to a higher gear, allowing him to travel faster without burning up the engine. At that point, the truck was beyond his control, with rapid loss of air pressure. On this evidence, the trial court did not err in allowing the jury to consider the 70-hour rule and whether violating it had any effect on the choices that Phillips made.

■ Defendants next assign error to the court's refusal to give two of their requested instructions, which, they contend, deprived them of "adequate" instructions on their theory of the case. All parties are entitled to have the jury instructed on their respective theories, if there is evidence relevant to those

theories, *Washburn v. Holbrook*, 106 Or App 60, 66, 806 P2d 702 (1991), and the instruction is a correct statement of the law. *Mason v. Allen et al*, 183 Or 638, 648, 195 P2d 717 (1948). We review the court's ruling for error of law and abuse of discretion. *State v. Wille*, 115 Or App 47, 55, 839 P2d 712 (1992).

■ Defendants requested these instructions:

Number 13:

"There is evidence to support a finding that defendant [Phillips] sounded his truck horn while approaching the point of the accident and that such horn would have been heard by a person of ordinary hearing, and that the highway was such that defendant could not turn farther to his left and pass plaintiff. In these circumstances defendant had a right to assume, until he had knowledge to the contrary, that all overtaken vehicles would give way to the right when their drivers heard the horn, and permit defendant to pass."

Number 10:

"The driver of a vehicle that is being overtaken should not speed up, but on the contrary in the exercise of ordinary care, the overtaken driver should move to the right and either slow down or maintain a uniform rate of speed until the overtaking vehicle has safely passed."

Defendants contend that the requested instructions are a correct statement of the duties of an overtaken driver and that they applied to plaintiff under the circumstances shown by defendants' evidence. That evidence sought to establish that plaintiff caused the accident by changing lanes.

We do not agree that defendants have demonstrated that their requested instructions are a correct statement of Oregon law. At trial, they supported instruction number 13 by citing *Furtado v. Bird*, 26 Cal App 152, 146 P 58 (1914). No authority was given for instruction number 10. On appeal, defendants argue that the instructions conform to ORS 811.370(1)(b), ORS 811.375(1) and ORS 811.400(1),[4] statutes that address lane use and unsignaled lane changes.

---

[4] ORS 811.370 provides:

"(1) A person commits the offense of failure to drive within a lane if the person is operating a vehicle upon a roadway that is divided into two or more clearly marked lanes for traffic and the driver does not:

"(a) Operate the vehicle as nearly as practicable entirely within a single lane; and

The requested instructions do not restate the content of those statutes. The statutes are not authority for defendants' position that a horn will be heard by a person of "ordinary hearing" and that the person sounding the horn has the "right to assume" that an overtaken vehicle will give way. The statutes also do not mandate that the driver of an overtaken vehicle not "speed up," but rather "move to the right" until the overtaking vehicle has passed.

The requested instructions tell the jury that plaintiff had the duty to get out of the way of Phillips' truck. Defendants argue, however, that the instructions comport with evidence that showed that plaintiff caused the accident. When Phillips realized that his brakes were "in trouble," he started flashing his lights. The lane in front of him was clear, and Phillips testified that all traffic remained in the right-hand lane, allowing him to pass. Bradley, another truck driver, testified that plaintiff pulled into the passing lane. Bradley testified that he first saw plaintiff's van when it moved from the passing lane to the right-hand lane, cutting directly in front of him, forcing him to hit his brakes and slow down. While Bradley watched the "erratic" driving of the van, he heard a CB warning and saw Phillips' truck overtaking him in the left-hand lane, its flashers and headlights operating. He heard the horn. As the truck passed, Bradley saw plaintiff's van abruptly slow and move into the passing lane, directly in front of Phillips' truck. Bradley testified that there was no traffic in front of plaintiff to cause her to change lanes. There was additional testimony that plaintiff was driving erratically

---

"(b) Refrain from moving from that lane until the driver has first made certain that the movement can be made with safety."

ORS 811.375 provides:

"(1) A person commits the offense of unlawful or unsignaled change of lanes if the person is operating a vehicle upon a highway and the person changes lanes by moving to the right or left upon the highway when:

"(a) The movement cannot be made with reasonable safety; or

"(b) The driver fails to give an appropriate signal continuously during not less than the last 100 feet traveled by the vehicle before changing lanes."

ORS 811.400 provides:

"(1) A person commits the offense of failure to use an appropriate signal for a turn, lane change or stop if the person is operating a vehicle that is turning, changing lanes, stopping or suddenly decelerating and the person does not make the appropriate signal under ORS 811.395 by use of signal lamps or hand signals."

and changing lanes and that there was no traffic to have caused plaintiff to change lanes.

However, defendants' instruction ignores the contrary evidence that plaintiff could not get out of the way of Phillips' truck. There was testimony that plaintiff could not have heard the horn because the brake failure exhausted the truck's air supply, which also operated the horn. The air supply rapidly dissipated from the point when Phillips first realized his brakes were smoking, about two to three miles down the hill. Although he started blowing his horn at that point, by the time of the collision, the truck was out of air, and Phillips could no longer activate the horn. Eyewitnesses to the collision testified that, at and near the collision, the horn was not operative, and no one heard it.[5]

There was also eyewitness testimony that it was impossible for plaintiff to move to the right-hand lane, because there were two large trucks in that lane. Plaintiff's van had passed the first truck and the space between the two trucks as defendants' truck approached. The collision occurred near the front bumper of the lead truck.

In short, defendants' requested instructions prescribed a duty for plaintiff that the law does not require and that was not dictated by the evidence. Furthermore, the jury was instructed on plaintiff's negligence in failing to heed audible and visual warnings from the overtaking truck and in failing to yield. It was instructed on the common law of negligence and a driver's duty both to maintain a lookout when changing lanes and to anticipate passing by an overtaking vehicle. The instructions adequately advised the jury of plaintiff's duties. *Hoagland v. Solie*, 247 Or 38, 41, 427 P2d 109 (1967). Viewing the instructions as a whole, *Hanson v. Bussman*, 274 Or 757, 781, 549 P2d 1265 (1976), we conclude that the trial court did not err in refusing to give defendants' requested instructions.

---

[5] Bradley was not an eyewitness to the collision and testified contrary to physical facts. For example, he testified that the truck stopped at the time of the collision; the physical evidence showed that it did not stop until 2.6 miles past the point of collision. He also testified that he accelerated his own vehicle past the collision. The evidence showed that that was not possible, because there were two trucks in the right lane, the collision occurred in the left lane, and there were construction barriers on either side.

■ We turn to plaintiff's appeal. She assigns error to the trial court's holding that ORS 18.560 applied and that it mandated entry of a judgment that was less than the jury's verdict. She argues that the statute cannot constitutionally be applied to reduce the damages awarded by a jury. ORS 18.560(1) provides:

"Except for claims subject to [Oregon's Tort Claims Act] and [Oregon's Workers' Compensation Law], in any civil action seeking damages arising out of bodily injury, including emotional injury or distress, death or property damage of any one person including claims for loss of care, comfort, companionship and society and loss of consortium, the amount awarded for noneconomic damages shall not exceed $500,000."

Defendants argue that ORS 18.560, as applied to this statutory wrongful death action, raises no constitutional questions. They argue that "[a]s surely as the legislature has plenary power to amend any of its enactments, so also it has the power to amend the remedy in a statutory wrongful death action."

We discussed the constitutionality of ORS 18.560(1) in *Tenold v. Weyerhaeuser Co.*, 127 Or App 511, 873 P2d 413 (1994), decided after this case was argued. In *Tenold*, the plaintiff argued, as does plaintiff here, that the statute violated Article VII (amended), section 3, of the Oregon Constitution, which provides, in part:

"In actions at law, where the value in controversy shall exceed $200 dollars, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any court of this State, unless the court can affirmatively say there is no evidence to support the verdict."

We concluded that the context of Article VII (amended), section 3, demonstrated

"that a jury's verdict on damages, which is supported by the evidence, is a 'fact tried by a jury' under that [constitutional] amendment, and that ORS 18.560 violates that amendment, because it compels the court to reexamine the verdict by requiring the court to nullify the jury's factual determination to the extent that it exceeds the legislature's damage cap." 127 Or App at 524.

Assuming the validity of defendants' argument that the legislature can amend the remedy in a statutory wrongful death action, it did not do so. In ORS 18.560(1), with specific exceptions for the Tort Claims Act and the Workers' Compensation Law, the legislature provided that the monetary limit applies to "any civil action seeking damages arising out of bodily injury * * *." Although an action for wrongful death is a statutory action, it is also a civil action and, as such, is within the reach of ORS 18.560. Consequently, the jury's factual determination as to damages is subject to the constitutional requirements of Article VII (amended), section 3. The trial court erred in applying the monetary limits of ORS 18.560(1).

Because of our decision, we need not address plaintiff's remaining assignment of error.

On appeal, reversed and remanded with instructions to enter judgment for plaintiff in accordance with the jury verdict; affirmed on cross-appeal.