Argued and submitted February 5, 2014, judgment in favor of Oregon Beta
Chapter of Phi Kappa Psi Fraternity reversed and remanded, otherwise
affirmed September 2, 2015

Cassandra SCHEFFEL,
*Plaintiff-Appellant,*

*v.*

OREGON BETA CHAPTER OF
PHI KAPPA PSI FRATERNITY,
an unincorporated association,
aka Oregon Beta Chapter of Phi Kappa Psi;
and Phi Kappa Psi Fraternity, Inc.,
a foreign corporation,
*Defendants-Respondents,*

*and*

DELTA CHI FRATERNITY,
aka Delta Chi, an unincorporated association;
The Delta Chi Fraternity, Inc., a foreign corporation;
and Gregory Thomas Sako, an individual,
*Defendants.*

Benton County Circuit Court
1010510; A152194

359 P3d 436

W. Eugene Hallman argued the cause for appellant. With him on the briefs were Robert S. Perkins, Mark R. Bocci, James M. Pippen, and Hallman Law Office.

Trish A. Walsh argued the cause for respondents. With her on the briefs were Brad C. Stanford and Farleigh Wada Witt.

Before Ortega, Presiding Judge, and DeVore, Judge, and Schuman, Senior Judge.

ORTEGA, P. J.

DeVore, J., concurring in part, dissenting in part.

## ORTEGA, P. J.

Plaintiff brought a negligence action against defendants Phi Kappa Psi Fraternity (Phi Psi) and Phi Psi's local chapter (Beta Chapter)[1] at Oregon State University (OSU) after she was raped by Gregory Sako, a chapter member, during a Halloween party at the chapter's fraternity house in Corvallis.[2] Plaintiff's claim against the local chapter was based on theories of premises liability, "failure to control," and negligence *per se*. She asserted a claim against Phi Psi on the theory that Phi Psi was vicariously liable as the chapter's principal and, separately, that Phi Psi had negligently performed a duty that it had voluntarily undertaken to supervise, control, and guide the local chapter.

Defendants moved for summary judgment, arguing that the undisputed facts established that the risk of Sako's sexual assault of plaintiff was not reasonably foreseeable to the chapter. Further, the chapter asserted that, as a matter of law, it had satisfied its duty to plaintiff, who was a social guest, to make the premises safe during the party. Beta Chapter also contended that it did not create an unreasonable risk of harm of the type that befell plaintiff, pointing to safety measures that it had implemented for the party, as well as its lack of knowledge of Sako's (or any other chapter member's) propensity for violence. Finally, the chapter asserted that, as to plaintiff's negligence *per se* count[3] of negligence, the Oregon Administrative Rules on

---

[1] Plaintiff's original complaint named Oregon Beta of Phi Kappa Psi Association (the House Corporation) as a defendant, as well as Phi Psi. The House Corporation owns the chapter house and is a separate entity from Beta Chapter. After defendants moved for summary judgment, plaintiff sought to amend her complaint to substitute Beta Chapter in place of the House Corporation. The court, over defendants' objection, allowed plaintiff to amend her complaint. The court's ruling on that matter is the subject of defendants' cross-assignment of error, and we reject that cross-assignment without further discussion. Given our resolution of that issue against defendants, and to avoid confusion, we generally refer to Beta Chapter throughout the opinion as if plaintiff had named it as a defendant in the original complaint.

[2] Plaintiff also asserted claims against Sako and the fraternity that cohosted the party but eventually dismissed those claims. Accordingly, neither are parties to this appeal.

[3] "[N]egligence *per se* is not a separate claim for relief, but is simply shorthand for a negligence claim in which the standard of care is expressed by a statute or rule." *Abraham v. T. Henry Construction, Inc.*, 350 Or 29, 35 n 5, 249 P3d

which plaintiff relied had been repealed, and thus, could not sustain plaintiff's negligence *per se* count. Beta Chapter also asserted that, even if the administrative rules applied, there was no factual dispute that it had complied with the rules. As for plaintiff's agency theory against Phi Psi, the national organization claimed that it did not have the requisite right to control the conduct of the local chapter that was asserted as the basis for plaintiff's claims, and that it did not voluntarily undertake any duty to render services to plaintiff or the chapter that would have made it liable for plaintiff's injuries. The trial court granted summary judgment and dismissed plaintiff's claims.

Plaintiff appeals, contending that the evidence, viewed in the light most favorable to her, was sufficient to create a genuine issue of material fact as to each of her claims. In particular, plaintiff contends that the chapter, as the possessor of the chapter house, owed plaintiff a duty to exercise reasonable care as to activities that occurred at the house; that the chapter knew or had reason to know of a reasonably foreseeable risk of sexual assault of a female guest in the circumstances of the party; and that the chapter's conduct created an unreasonable risk of harm to plaintiff and fell below the applicable standard of care. She points to evidence in the summary judgment record and an affidavit filed under ORCP 47 E. As for her claims against Phi Psi, she maintains that there was sufficient evidence to create a question of fact as to whether the national organization had sufficient control of the chapter to be held vicariously liable for the chapter's negligence and, alternatively, that there was sufficient evidence that Phi Psi undertook a duty to supervise and guide local chapter members, and that Phi Psi's negligent performance of that duty led to the harm that plaintiff suffered.

Ultimately, we conclude that the trial court erred by granting summary judgment to Beta Chapter on plaintiff's

---

534 (2011). Instead, plaintiff's "claim" for negligence *per se* is "simply a second 'count' of negligence—not a separate claim for relief." *Alcutt v. Adams Family Food Services, Inc.*, 258 Or App 767, 784, 311 P3d 959 (2013), *rev den*, 355 Or 142 (2014). Accordingly, throughout this opinion, we use "plaintiff's negligence *per se* count" to refer to plaintiff's claim based on Beta Chapter's alleged violation of the Oregon Administrative Rules governing social organizations at OSU.

negligence claim because evidence in the summary judgment record established factual questions as to whether plaintiff's sexual assault, in the circumstances of the Halloween party, was reasonably foreseeable to the chapter, and whether the chapter's conduct fell below the applicable standard of care. We also conclude that the trial court incorrectly granted summary judgment on plaintiff's negligence *per se* count. As for plaintiff's claims against Phi Psi, we conclude that summary judgment was appropriate. Accordingly, we reverse and remand the judgment as to Beta Chapter, and otherwise affirm the judgment.

## I. FACTS

On review from the grant of summary judgment, we review the summary judgment record in the light most favorable to the nonmoving party—in this case, plaintiff—and draw all reasonable inferences in her favor. *Jones v. General Motors Corp.*, 325 Or 404, 413, 939 P2d 608 (1997). We state the facts consistently with that standard.

Phi Psi is headquartered in Indiana and has about 100 local chapters nationwide. As relevant here, its governing documents, including its constitution and bylaws, grant the national organization the power to create, suspend, and revoke local charters, and the power to suspend, expel, or otherwise discipline any fraternity member after due notice and a hearing. Phi Psi also has the power to appoint a committee of alumni to supervise the affairs of any chapter whenever necessary to correct conditions "prevailing at the time," although the local chapter has "original jurisdiction" over the conduct of its undergraduate members, including the right to initiate, suspend, or expel a member.

Phi Psi requires local chapter officers to review and confirm receipt of the fraternity's risk-management policy, which includes sections on "Social Programming and Alcohol" and "Sexual Assault." The policy is the "baseline," (*i.e.*, local chapters cannot adopt a policy that is contrary to it) and includes information and statistics related to "Greek-related accidents." The policy explains various precautions that are necessary to establish an atmosphere that minimizes the likelihood of alcohol-related problems, including

hosting only "BYOB" parties, requiring age identification and wristbands, monitors, and "never allow underage members or guests to possess or consume alcohol." The section on sexual assault notes that alcohol "decreases inhibitions" and that, on college campuses, acquaintance rape may be "as high as 85 percent" of rapes, that "alcohol plays a prevalent role in sexual assaults," and that 97 percent of sexual abuse cases brought against fraternities involved alcohol. In early 2008, Phi Psi's Director of Expansion visited Beta Chapter and presented information about the fraternity's risk management program to local chapter members, including Sako.

Phi Psi also requires local chapter members to complete a computer-based educational program and to pass a related test to receive the fraternity's full membership benefits. The program contains lengthy modules that aim to educate students on responsible alcohol use and preventing sexual assaults.

In 2008, Beta Chapter's membership consisted of undergraduate students enrolled at OSU who had been initiated into Phi Psi. The chapter occupied a house in Corvallis that was owned by the House Corporation. The house consisted of a basement, as well as two floors that contained bathrooms, common areas, and private rooms. Although the local chapter had a "general policy" that underage members could not drink alcohol, that policy was not enforced. In fact, it was common for underage members to keep alcohol in their rooms and to drink it in their rooms and in the common areas of the house—although during some social events, members' consumption of alcohol in the common areas was prohibited. At times, older chapter members purchased alcohol for underage members. The chapter president, Gerritz, had confiscated alcohol from a member on occasion when that member was "out of control," but, otherwise, no restrictions were enforced on members' consumption of alcohol in their private rooms. Gerritz was aware of policies that prohibited all access to private rooms during social events, particularly at sororities, but Phi Psi did not have such a rule.[4]

---

[4] For example, Delta Chi, the cohost of the Halloween Party, had a policy that no guests could enter a private room during a party.

OSU's Office of Greek Life provides various services and support to fraternities at OSU. Kerr, the head of the office, has recommended to fraternities that access to private rooms should be closed during social events that include alcohol because "control disappears" when individuals move into private rooms. He stated that access to private rooms during social events causes safety issues, including a danger of sexual misconduct and underage alcohol consumption. Kerr noted that he "probably" had a conversation with each fraternity over the preceding 10 years, but he did not specifically remember a conversation with anyone at Beta Chapter.

Beta Chapter initiated Sako as a member of Phi Psi in April 2008 when he was 19 years old. He lived in the fraternity house with a roommate on the main floor. Sako and his roommate regularly possessed alcohol in their room and regularly consumed alcohol in their room and in the common areas of the house. In October 2008, Sako was generally drinking alcohol twice during the week and, on the weekends, would consume anywhere from 4 to "15 or 20 drinks."

Beta Chapter, along with Delta Chi's OSU chapter, hosted an invitation-only Halloween party on October 31, 2008, at the chapter's house. The chapter hired two security guards for the party, who were tasked with patrolling the premises, enforcing "event policies," reporting violations to Gerritz, ensuring that guests used a single entrance, handling potential problems, and calling the police if needed. Four members of the host fraternities served as "sober monitors" by checking in guests at the house entrance, tracking the number of guests, and directing guests to the basement where the party was held. Neither fraternity served alcohol at the party. Instead, guests age 21 and over could bring beer, check it at a bar that was monitored by the chapter's members, and, after showing proof of age, retrieve one beer at a time. The fraternity designated the main floor bathroom for male guests and chapter members, and the second floor bathroom for female guests. Access to private rooms on the main and second floors was limited to chapter members and their guests.

By the time the party began sometime after 8:00 p.m., Sako had already been drinking alcohol in his room with various people, and he was intoxicated by 9:00 p.m. Gerritz saw Sako between 9:30 p.m. and 10:00 p.m. and told him to "go to his room." Gerritz asked other members to keep Sako in his room because he was "yelling like a fool," and Gerritz stopped by Sako's room several times to make sure he was alright. Although the party was scheduled to end after midnight, by 10:45 p.m., Gerritz felt that he had lost control of "the outside" of the house because an unruly group of people who were not on the invitation list were trying to gain admittance to the party. He decided to shut down the party and clear the house of guests. Although the timing is unclear, somewhere around that time, Sako proceeded to the dance floor where he met plaintiff, who had been invited to the party by a member of Delta Chi. At some point, she accompanied Sako to his room on the main floor of the house, where he sexually assaulted her.

## II.  ANALYSIS

Summary judgment is appropriate if there is no genuine issue of material fact for trial and the moving party is entitled to prevail as a matter of law. ORCP 47 C. For a plaintiff in a negligence action to avoid summary judgment, the plaintiff must show the existence of a factual question on all dispositive issues framed by the defendant's motion. *Two Two v. Fujitec America, Inc.*, 355 Or 319, 326, 325 P3d 707 (2014) (party seeking summary judgment frames the issues on which party opposing summary judgment must show the existence of a factual question). There is no issue of material fact, if, based on the record, "no objectively reasonable juror could return a verdict for the adverse party on the matter that is the subject of the motion for summary judgment." ORCP 47 C.

A.  *Beta Chapter*

We first address plaintiff's claims against Beta Chapter and then address her claims against Phi Psi. To start, we review the negligence theories advanced by plaintiff against Beta Chapter and the issues raised by the chapter in its summary judgment motion, because they frame the issues on appeal.

### 1.  *Claims against Beta Chapter*

Plaintiff first alleged that Beta Chapter was negligent based on a theory of premises liability. Plaintiff alleged that as a social guest she was an "invitee" of the chapter, and that the chapter failed to satisfy its duty to make the property reasonably safe for her visit because it, among other things, (1) failed to properly monitor the party, (2) permitted underage members of the fraternity to possess and consume alcohol in their private rooms, and (3) allowed chapter members and their guests unmonitored access to private rooms.

Plaintiff also alleged that Beta Chapter was negligent based on the more general theory of "failure to control." Under that theory, plaintiff asserted that the chapter knew or should have known in the exercise of reasonable care that there was a foreseeable risk of sexual assault of female guests during a party where (1) underage members had access to private alcohol supplies, (2) the party was not properly monitored, and (3) the chapter allowed members and their guests access to private rooms during the party. Plaintiff further alleged that the chapter's conduct failed to protect her from the risk of that harm.

Finally, plaintiff alleged that Beta Chapter was liable under the theory of negligence *per se*. According to plaintiff, the chapter's failure to comply with administrative rules that govern student social organizations violated, as a matter of law, the standard of care established by those rules. In particular, plaintiff claimed that the chapter violated applicable rules by serving alcohol to minors and visibly intoxicated persons, failing to provide security, failing to monitor for disorderly conduct, and failing to control access to alcohol in private rooms.

### 2.  *Summary judgment motion: Beta Chapter*

Beta Chapter sought summary judgment, insisting that there is no genuine issue of material fact as to the chapter's liability for Sako's criminal conduct. It asserted that plaintiff, as a social guest, was a licensee—not an invitee—for purposes of premises liability. Accordingly, the

chapter maintained that its duty to plaintiff was limited to the duty to use reasonable care to make the premises safe or to warn plaintiff of the condition of the premises and the risk involved *if* it knew or had reason to know that there was an unreasonable risk of harm *and* plaintiff did not know or have reason to know of the risk involved. Beta Chapter insisted that, in light of the chapter's limited duty, there was no evidence that it knew or had reason to know that there was an unreasonable risk to party attendees of sexual assault by Sako or any other chapter member because Sako's assault was the first and only known sexual assault to have occurred at the chapter house or to have involved any chapter member.

Similarly, Beta Chapter claimed that plaintiff's "failure to control" theory failed because, as a matter of law, it was not reasonably foreseeable to the chapter that plaintiff would be sexually assaulted at the party given that nobody knew of Sako's propensity for violence or of any sexual assaults by other chapter members, and the mere serving of alcohol (which the chapter argued did not occur) does not create an unreasonable risk that a person will become violent. Beta Chapter argued alternatively that it did not unreasonably create the risk of the harm that occurred because it lacked knowledge of Sako's propensity for violence and took precautionary steps to host a "good" party. Accordingly, the chapter explained that its conduct provided nothing more than "mere facilitation" of Sako's' criminal conduct, and that "mere facilitation" is not enough, as a matter of law, to demonstrate foreseeability.

As for plaintiff's negligence *per se* count, Beta Chapter contended that, because the administrative rules on which plaintiff relied had been repealed after the assault but before trial, plaintiff could not rely on those rules to sustain negligence *per se*. Alternatively, Beta Chapter maintained that there was no factual dispute that it had complied with the rules.

Plaintiff, in part, responded to Beta Chapter's motion with a declaration under ORCP 47 E that she had retained an expert "who is available and willing to testify to admissible facts or opinions creating a question of

fact."[5] In response, the chapter argued to the trial court that an ORCP 47 E affidavit can defeat summary judgment only when the plaintiff is required to provide the opinion of an expert in order to establish a given fact and that, in this case, expert testimony was not required to establish any material facts.

The trial court granted summary judgment and dismissed plaintiff's claims. Plaintiff appeals, and on appeal, the parties generally reprise and refine the arguments that they made to the trial court.

### 3. *General negligence principles*

We begin with some general negligence principles to provide context to the specific issues framed by plaintiff's claims and Beta Chapter's summary judgment motion— specifically, foreseeability and standard of care. Under Oregon law,

"unless the parties invoke a status, a relationship, or a particular standard of conduct that creates, defines, or limits the defendant's duty, the issue of liability for harm actually resulting from defendant's conduct properly depends on whether that conduct unreasonably created a foreseeable risk to a protected interest of the kind of harm that befell the plaintiff."

*Fazzolari v. Portland School Dist. No. 1J*, 303 Or 1, 17, 734 P2d 1326 (1987). That is, in the absence of a special status or relationship, the appropriate question is "whether the defendant's conduct resulted in a foreseeable and unreasonable

---

[5] ORCP 47 E provides:

"[Summary judgment motions] are not designed to be used as discovery devices to obtain the names of potential expert witnesses or to obtain their facts or opinions. If a party, in opposing a motion for summary judgment, is required to provide the opinion of an expert to establish a genuine issue of material fact, an affidavit or a declaration of the party's attorney stating that an unnamed qualified expert has been retained who is available and willing to testify to admissible facts or opinions creating a question of fact, will be deemed sufficient to controvert the allegations of the moving party and an adequate basis for the court to deny the motion. The affidavit or declaration shall be made in good faith based on admissible facts or opinions obtained from a qualified expert who has actually been retained by the attorney who is available and willing to testify and who has actually rendered an opinion or provided facts which, if revealed by affidavit or declaration, would be a sufficient basis for denying the motion for summary judgment."

risk of harm of the kind that the plaintiff suffered." *Towe v. Sacagawea, Inc.*, 357 Or 74, 86, 347 P3d 766 (2015). That principle is based on the general proposition that a plaintiff does not need to prove that the defendant owed the plaintiff a. "duty" because everyone owes each other the duty to act reasonably in light of foreseeable risks of harm. *Id.* Where a party invokes a status, relationship, or a particular standard of conduct, then that relationship may create, define, or limit the defendant's duty to the plaintiff. *Oregon Steel Mills, Inc. v. Coopers & Lybrand, LLP*, 336 Or 329, 341, 83 P3d 322 (2004); *see, e.g., Monnet v. Ullman et al.*, 129 Or 44, 55, 276 P 244 (1929) (explaining that the only duty owed to a trespasser is to avoid injury as a result of willful or wanton conduct).

In this case, plaintiff invoked a special relationship under premises liability law, and the parties dispute how Beta Chapter's duty as the possessor of property should be defined. Because the chapter's duty to plaintiff and the scope of that duty are threshold issues that affect the rest of our analysis, we resolve them before further discussing the applicable negligence principles.

Plaintiff claims that, because she was a licensee under premises liability law, the chapter—as the possessor of the property—had a duty to exercise reasonable care for her protection as to activities that occurred on the land.[6] In contrast, the chapter claims that it owed a duty only to exercise reasonable care to make the premises safe *if* it knew or had reason to know of an unreasonable risk of harm *and* the licensee did not know or had no reason to know of the risk. We agree with plaintiff. The Supreme Court has held that, as to activities on the land, the possessor has a duty to exercise reasonable care for the protection of a licensee. *Ragnone v. Portland School Dist. No. 1J*, 291 Or 617, 623-24, 633 P2d 1287 (1981) (where the plaintiff alleged that a school district conducted an activity on school premises without adequate

---

[6] Plaintiff alleged in her complaint that she was an invitee and, in the trial court, the parties disputed whether plaintiff's status as a social guest would qualify her as a licensee or an invitee under premises liability law. On appeal, defendants again assert that plaintiff is a licensee. Plaintiff appears to have abandoned the argument that she made below, instead contending that the distinction between licensee and invitee is immaterial when an injury is sustained as a result of activities on the land as opposed to the condition of the land.

supervision and without maintaining proper control, the school district had a duty to exercise reasonable care in the conduct of its activities). And importantly, "activities on the land" include social functions like the Halloween party at issue in this case. *Blystone v. Kiesel*, 247 Or 528, 531-32, 431 P2d 262 (1967) (holding that there is an obligation to exercise reasonable care for the protection of a licensee during a social gathering). Accordingly, the chapter had a duty to plaintiff to exercise reasonable care in the conduct of its activities—specifically in this case, the Halloween party.

However, as to the *scope* of the chapter's duty to plaintiff, even "when a special relationship is the basis for the duty of care owed by one person to another, * * * if the special relationship * * * does not prescribe a particular scope of duty, then '[c]ommon law principles of reasonable care and foreseeability of harm are relevant.'" *Oregon Steel Mills*, 336 Or at 342 (quoting *Cain v Rijken*, 300 Or 706, 717, 717 P2d 140 (1986). The parties appear to agree that the scope of the chapter's duty to plaintiff is limited to harm to plaintiff that was reasonably foreseeable to the chapter.

a. Foreseeability

However, they disagree as to whether, if the chapter was negligent in the manner alleged by plaintiff, the harm that plaintiff suffered was reasonably foreseeable. In cases where the "harm-producing force" is an intentional intervening criminal act of a third party, the defendant generally has a duty to protect against criminal conduct by third parties that the defendant reasonably could foresee. *Stewart v. Kids Incorporated of Dallas, OR*, 245 Or App 267, 278, 261 P3d 1272 (2011), *rev dismissed as improvidently allowed*, 353 Or 104 (2012); *see also McPherson v. Oregon Dept. of Corrections*, 210 Or App 602, 612, 152 P3d 918 (2007) (the scope of a landlord's duty to its tenants includes a "duty to take reasonable steps to protect tenants in the property's common areas from reasonably foreseeable criminal acts by third persons"). Accordingly, the second issue framed by the parties is whether Beta Chapter could have foreseen that plaintiff would fall victim to criminal conduct as a result of its actions. *See Cunningham v. Happy Palace, Inc.*, 157 Or App 334, 340, 970 P2d 669 (1998) (reversing summary

judgment because there was "evidence from which a jury could find that defendant could have reasonably foreseen that it was placing plaintiff at risk of criminal assault by forcing her to leave the safety of the restaurant before she could arrange for transportation home").

Accordingly, we examine whether there was evidence in the summary judgment record that would allow a reasonable factfinder to find or reasonably infer that the chapter knew or should have known that, if it was negligent as alleged by plaintiff, that negligence placed plaintiff at an unreasonable risk of criminal conduct. *See, e.g., Chapman v. Mayfield*, 263 Or App 528, 531, 329 P3d 12, *rev allowed*, 356 Or 400 (2014) (explaining relevant inquiry on review of summary judgment).

Plaintiff concedes that there is no evidence that the chapter knew of Sako's propensity for violence; nevertheless, she asserts that the chapter knew more generally about an epidemic of alcohol-related sexual assaults involving college fraternities, and that the chapter created an unreasonable risk of sexual assault by permitting underage members to consume alcohol and by allowing chapter members and their guests access to private rooms during parties where alcohol was available. Given that there was evidence of the chapter's knowledge of the prevalence of alcohol-related sexual assaults, plaintiff asserts that that evidence, in conjunction with her ORCP 47 E affidavit, was sufficient to create a question of fact as to whether it was reasonably foreseeable that a female guest would be subject to sexual assault in the circumstances of the Halloween party.

Beta Chapter asserts that nothing it did could foreseeably have placed plaintiff in harm's way and that the requisite foreseeability was not present as a matter of law. The chapter claims that plaintiff's reliance on the its knowledge of national statistics regarding the prevalence of alcohol-related sexual assaults involving fraternities is not enough to create a factual question on foreseeability. Defendants take the position that the court must look to case-specific facts and cannot rely on the broad proposition that, because alcohol-related sexual assaults are a problem nationally, such a risk of harm was foreseeable in this case.

Therefore, at the heart of the foreseeability issue in this case is whether, given that the chapter had no specific knowledge of Sako's propensity for violence nor of any other sexual assaults involving chapter members or the chapter house, there was sufficient evidence to create a question of fact as to foreseeability. For the reasons that follow, we conclude that plaintiff established a question of fact on foreseeability.

To begin, we disagree with defendants that Oregon case law requires the conclusion that, in the absence of specific knowledge by the chapter of the propensity for violence of Sako or other chapter members, a risk of third-party criminal conduct is unforeseeable as a matter of law. We acknowledge that in many of our negligence cases, a defendant's knowledge of a specific perpetrator's propensity for violence provides the basis for establishing foreseeability of harm. *See, e.g., Panpat v. Owens-Brockway Glass Container*, 188 Or App 384, 394-95, 71 P3d 553 (2003) (the defendant's knowledge that the third party had significant mental health problems related to the breakup of a romantic relationship with the decedent, that the third party was on psychiatric medical leave pending further mental health evaluation, and that the third party and the decedent had had previous verbal confrontations, made it reasonably foreseeable that the third party would commit criminal acts against the decedent at the defendant's business); *Washa v. DOC*, 159 Or App 207, 225, 979 P2d 273 (1999), *aff'd by an equally divided court*, 335 Or 403, 69 P3d 1232 (2003) ("[O]ur general foreseeability analysis in a negligent supervision claim properly turns on whether—in light of the third party's criminal history—the defendant could reasonably foresee that the third party, if inadequately supervised, would engage in the kind of criminal conduct that ultimately harmed the plaintiff."). In other cases, however, the foreseeability of third-party criminal acts has been established not by knowledge of a particular actor's propensity for violence but by knowledge of the risk of harm posed by criminals in general in a particular situation.

For example, in *Torres v. United States Nat. Bank*, we concluded that the plaintiff stated facts that, if proven,

could establish that the defendant bank should reasonably have anticipated criminal conduct against its invitees based on evidence that "due to 'the place or character of his business, or [the defendant's] past experience,'" the invitee's safety might be endangered. 65 Or App 207, 670 P2d 230, *rev den*, 296 Or 237 (1983) (quoting *Restatement (Second) of Torts* § 344 comment f (1965)). There, the plaintiff had been shot while making a night deposit at the defendant bank. Because the trial court had dismissed the plaintiff's claims at the pleading stage, we explained that, based on the plaintiff's allegations, the plaintiff might be able to introduce evidence of robberies at other night depositories in the area, or be able to compare evidence of robberies at night depositories located on the street with robberies at depositories hidden from public view, or even introduce evidence showing the likelihood of danger to invitees making deposits after banking hours. *Id.* at 214-15; *see also Cunningham*, 157 Or App at 339-40 (where the plaintiff had been injured by the criminal acts of a third party after being ejected from a bar without being allowed to arrange for safe transportation home, there was evidence from which a jury could find that defendant could have reasonably foreseen that it was placing the plaintiff at a general risk of criminal assault).

Our recent decision in *Chapman* illustrates the different types of evidence that may be available to a plaintiff to prove foreseeability in a case involving third-party criminal conduct. There, we addressed whether it was foreseeable to the defendant tavern owner that serving a visibly intoxicated person could create an unreasonable risk that the person would engage in violent conduct. A patron of the defendant tavern had shot the plaintiffs after being served alcohol while visibly intoxicated. We noted that the plaintiffs could prove foreseeability by either (1) proving facts that showed that a tavern owner's "general observations and experiences 'in the business of serving alcohol' gave that tavern owner reason to know that violence would be a foreseeable risk of serving alcohol to a visibly intoxicated person," or (2) proving facts that "the tavern owner knew or had reason to know that the visibly intoxicated person in question had a propensity for violence that could be incited by further drinking." 263 Or App at 532 (citations omitted). Because the plaintiffs

in *Chapman* had no evidence of specific facts known by the defendant regarding the particular patron's propensity for violence, we examined the plaintiffs' "reason-to-know" theory that those in the business of serving alcohol know that visibly intoxicated drinkers frequently become violent. The plaintiffs relied on two key pieces of evidence: (1) a medical doctor's declaration that drinkers frequently become violent and that there is a link in medical, scientific, and lay literature between visible intoxication and increased violence, and (2) the testimony of a bartender from an "area bar" that when patrons become violent, it is "the alcohol talking." *Id.* at 532-33. We ultimately concluded that the plaintiffs' evidence failed to create a question of fact on foreseeability because it failed to establish that the defendant was on notice that serving a visibly intoxicated person created an unreasonable risk that the person would become violent. *Id.* at 535.

Central to our holding was the observation that the evidence would not allow a reasonable factfinder to infer the tavern owner's knowledge of the risk. We noted that the factfinder would have had to infer that (1) the tavern owner would generally know what medical experts in alcohol physiology know about the connection between intoxication and violence, (2) that the medical, scientific, and lay literature would be read by persons in the business of serving alcohol, and (3) that there were enough similarities between the operations and clientele of the defendant tavern and the other "area bar" that the bartender's observations at the "area bar" could be generalized to the defendant. *Id.* at 535-36. Because the evidence in the summary judgment record would have required a factfinder to make too many "intermediate inferences and assumptions" to reach a conclusion that the defendant should have known that serving a visibly intoxicated person would lead to the unreasonable risk that the person would act violently, we affirmed summary judgment. *Id.*

Here, however, the summary judgment record included evidence that would allow a reasonable factfinder to infer, without requiring "too many intermediate inferences and assumptions," that the chapter could reasonably

have foreseen a risk to female guests of sexual assault in the circumstances of the Halloween party. First and foremost, there is evidence in the summary judgment record that would support a finding that the chapter knew that alcohol-related sexual assaults were a foreseeable risk of hosting social events where alcohol is available, and that permissive alcohol use by underage members and access to private rooms during such social events increases the risk of sexual misconduct. Phi Psi requires local chapter members to complete computer-based educational programs that contain lengthy modules to educate students on issues of responsible alcohol use and the prevention of sexual assault. Phi Psi also requires local chapter officers to review and abide by risk-management policies on topics including "Social Programming and Alcohol" and "Sexual Assault." Such policies include statistical information affirming the prevalence of alcohol abuse in "Greek-related" accidents and sexual assaults (including statements such as "alcohol plays a prevalent role in sexual assaults"), and dictates that local chapters "establish an atmosphere that minimizes the likelihood of alcohol-related problems." It is also reasonable to infer from the record—viewed in the light most favorable to plaintiff—that the head of the Office of Greek Life had explained to Beta Chapter that access to private rooms during social events involving alcohol leads to a loss of control, which becomes a safety issue and leads to a danger of sexual misconduct.

Thus, the summary judgment record provides a basis for a reasonable factfinder to conclude that Beta Chapter knew that alcohol-related sexual assaults in college fraternities were a serious problem on college campuses nationwide and that precautions were necessary to minimize that risk. We do not understand prior Oregon cases to require a showing the chapter knew of specific members' propensity for violence for plaintiff to demonstrate that the chapter reasonably could have foreseen a risk of sexual assault of female guests. As the Supreme Court stated in *Fazzolari*, "evidence of foreseeability will differ depending on whether the risk of injury is claimed to be specific to a school, or schools generally, or a neighborhood, *or a class of potential victims* such as women or particular ethnic groups." 303 Or

at 21-22 (emphasis added). The risk of injury in this case was to guests of Beta Chapter. Evidence that Beta Chapter knew that alcohol-related sexual assaults were a potential problem when hosting social events where alcohol is available, and that permissive alcohol use by underage members and access to private rooms during such social events increased the risk of sexual misconduct is sufficient to create a question of fact as to foreseeability of the risk that materialized in this case. Given our resolution of that issue, we need not address whether plaintiff's ORCP 47 E affidavit would have created a question of fact as to foreseeability had the record been devoid of the evidence that Beta Chapter actually knew of the alcohol-related sexual assault problem.

Beta Chapter also contends that its conduct did not result in an "unreasonable risk of harm of the kind that plaintiff suffered," *see Towe*, 357 Or at 86 ("[T]he more traditional duty-breach analysis * * * is supplanted by the question whether the defendant's conduct resulted in a foreseeable and unreasonable risk of harm of the kind that the plaintiff suffered."), because the summary judgment record demonstrates that, at most, defendants provided "mere facilitation" of Sako's criminal acts. *See Buchler v. Oregon Corrections Div.*, 316 Or 499, 511-12, 853 P2d 798 (1993) (holding that "mere 'facilitation' of an unintended adverse result, where intervening intentional criminality of another person is the harm-producing force, does not cause the harm so as to support liability for it"). Defendants assert that nothing they did created an unreasonable risk of harm of sexual assault. They again rely on their lack of knowledge of Sako's propensity for violence, or any other known sexual assault incidents involving any of its members or the chapter house.

As we recently explained in *Piazza v. Kellim*, 271 Or App 490, 504, 354 P3d 698 (2015), in cases where the harm-producing force is the criminal act of a third party, the plaintiff must allege (and prove) that harm by third-party criminal conduct was "foreseeable to the defendant in a concrete way." The plaintiff may not rely on the abstract proposition that "crimes may occur and that the criminals perpetrating them may cause harm" because the Supreme Court rejected that theory in *Buchler*:

"While it is generally foreseeable that criminals may commit crimes and that prisoners may escape and engage in criminal activity while at large, that level of foreseeability does not make the criminal's acts the legal responsibility of everyone who may have contributed in some way to the criminal opportunity. In other words, in our society it is foreseeable that crimes may occur and that the criminals perpetrating them may cause harm. Thus, in a general sense, it is foreseeable that anyone whose conduct may in any way facilitate the criminal in committing the crime has played some part in the resulting harm. But mere 'facilitation' of an unintended adverse result, where intervening intentional criminality of another person is the harm-producing force, does not cause the harm so as to support liability for it."

316 Or at 511-12.[7]

Synthesizing *Buchler* in *Cunningham*, we stated that the

"plaintiff must establish that defendant's act did more than merely facilitate the criminal acts of third parties. The Oregon Supreme Court has stated that a defendant cannot be held liable for *all* intervening intentional criminal conduct that might conceivably occur because of defendant's acts or failures to act. '[M]ere "facilitation" of an unintended adverse result, where intervening intentional criminality of another person is the harm-producing force, does not cause the harm so as to support liability for it.' *Buchler*, 316 Or at 511-12 (rejecting 'facilitation' rationale of *Kimbler v. Stillwell*, 303 Or 23, 734 P2d 1344 (1987)). The court in *Buchler* held that, in order to survive a defendant's motion for summary judgment in a case involving the criminal acts of third parties, there must be facts in the record to support a conclusion that the defendant could

---

[7] In so doing, the Supreme Court retreated from its reasoning in *Kimbler v. Stillwell*, 303 Or 23, 734 P2d 1344 (1987), in which the question was whether a storeowner could be held liable for "facilitating" a thief's act of breaking into the store, stealing a gun and ammunition, and taking the gun to a location where he shot the plaintiff's decedent. *See Buchler*, 316 Or at 511 (discussing *Kimbler*). The court in *Kimbler*, citing *Fazzolari* and other cases, explained that, "[t]he fact that a plaintiff's injury was inflicted by the intentional, even criminal, act of a third person does not foreclose liability if such an act was a foreseeable risk facilitated by the defendant's alleged negligence." 303 Or at 27-28. The court then held that the plaintiff's allegations—that firearms known to be lightly secured in a retail store might be stolen and used against third persons—were sufficient to survive a motion to dismiss for failure to state a claim. *Id.*

have reasonably foreseen, as a result of the defendant's negligence, an unreasonable risk of such danger to the plaintiff. *Id.*"

157 Or App at 338-39.

As we understand the "mere facilitation" rationale in *Buchler*, the link between the defendant's negligent conduct and the risk of harm must also be reasonably foreseeable because, at some point, charging a person "with responsibility for all intervening intentional criminal conduct that might conceivably occur" cannot be reconciled with "a foreseeability analysis that requires that a defendant, to be liable, must have *unreasonably* created the risk of the sort of harm to plaintiff that befell him." *Buchler*, 316 Or at 511 (emphasis in original).

In *Buchler*, a prisoner escaped from state custody when his crew supervisor left the keys to the state's van in the ignition. *Id.* at 502. Two days after his escape, and 50 miles from the point of escape, the prisoner shot two people with a gun that he had stolen. *Id.* The estate of one of the victims sued the state, asserting negligence on the theory that the state had permitted the prisoner to escape, had failed to recapture him, and had failed to warn the public of his escape. The Supreme Court concluded that, as a matter of law, the harm that befell the plaintiff was not reasonably foreseeable to the state. As we noted in *McPherson*, in reaching that conclusion, the court emphasized that the harm that befell the plaintiff was "several steps removed from the conduct of the defendant: the defendant negligently left keys in a vehicle; a convict stole the vehicle; the convict then stole a gun from his mother; the convict then shot the plaintiff with that gun." 210 Or App at 618. As we explained,

> "[a]lthough the foreseeability of a convict escaping in an unattended vehicle with keys in it is relatively high, and the foreseeabilty of an escaped convict stealing a gun is relatively high, and the foreseeability of an armed escaped convict shooting a person is relatively high, the foreseeability of all three of those occurrences happening in sequence is 'at the outer margins.'"

*Id.* (quoting *Fazzolari*, 303 Or at 12).

This case does not present a similar problem. Here, we have no difficulty concluding that there is a relatively straightforward connection between the chapter's allegedly negligent conduct and the risk of harm that befell plaintiff. Plaintiff introduced evidence that would support a finding that the chapter knew that alcohol-related sexual assaults were a risk in certain circumstances at fraternities on college campuses nationwide, and that, among other things, the chapter permitted underage members to possess and consume alcohol in private rooms and failed to prohibit access to private rooms during a social event where alcohol was available. Given that there was evidence that would support the conclusion that the chapter knew of the risk of alcohol-related sexual assault at an event like the Halloween party, plaintiff established a question of fact as to whether the chapter was on notice that its conduct would create a risk of the kind of harm that befell her. *Cf. Oregon Steel Mills*, 336 Or at 345 (holding that "the risk of a decline in plaintiff's stock price in June 1996 was not a reasonably foreseeable consequence of defendant's negligent acts in 1994 and early 1995"), and *McPherson*, 210 Or App at 618 (criminal harm is not foreseeable where the risk of harm would have to "result from some strange 'concatenation of highly unusual circumstances,' * * * [or] an extended sequence of improbable chance occurrences." (quoting *Stewart v. Jefferson Plywood Co.*, 255 Or 603, 609, 469 P2d 783 (1970))).

The dissent concludes that Beta Chapter cannot be liable for plaintiff's injuries because, as a matter of law, it could not reasonably foresee a risk of sexual assault by a third party at the Halloween party. The dissent reaches that conclusion based on the lack of evidence that Beta Chapter had any knowledge of Sako's propensity for violence, and on the failure of plaintiff to produce evidence of prior sexual assaults at the chapter house or at other fraternities or sororities at OSU. As for the lack of evidence of Sako's propensity for violence, the parties did not dispute that point, and our analysis does not touch on it. Rather, at the heart of our disagreement is the dissent's conclusion that Beta Chapter cannot be liable under Oregon negligence law because plaintiff presented no evidence of prior sexual assaults at the house or at other fraternities or sororities

at OSU. The dissent concludes that in the absence of "specific facts" to show that Beta Chapter knew or had reason to know from its experience that its location threatened plaintiff with an unreasonable risk of criminal assault, the assault of plaintiff was unforeseeable as a matter of law. 273 Or App at 440 (DeVore, J., concurring in part and dissenting in part).

In short, as our discussion indicates, foreseeability in cases involving third-party criminal conduct is not so strictly limited. The relevant inquiry is ultimately whether there was evidence in the summary judgment record that would allow a reasonable factfinder to find or reasonably infer that the chapter knew or should have known that, if it was negligent in the manner alleged by plaintiff, that negligence placed plaintiff at an unreasonable risk of criminal conduct. Certainly evidence that Beta Chapter knew that prior criminal activity had occurred at a specific location is evidence that could satisfy that standard. But, evidence like that presented in this case—evidence that the chapter, as an organization that hosted social events attended by underage college students and their guests, had specific knowledge of the risk of criminal assault in circumstances like that of the Halloween party—is enough to create a jury question on foreseeability. Again, there was evidence in the summary judgment record that would allow a reasonable factfinder to conclude that Beta Chapter knew that alcohol-related sexual assaults were a foreseeable risk of hosting social events where alcohol is available, and that permissive alcohol use by underage members and access to private rooms during such social events increased the risk of sexual misconduct. 273 Or App at 443.

Accordingly, we do not share the dissent's view that existing Oregon negligence law cuts off liability for third-party criminal conduct unless there is specific evidence of the criminal propensity of a third party under control of the defendant or evidence of past criminal activity at a specific location. To the extent that the dissent argues that *Buchler* drew that line, we disagree. First, as relevant here, we understand *Buchler* to stand for the proposition that, at some point, harm that befalls a plaintiff that is "several

steps" removed from the negligent conduct of the defendant, is not foreseeable as a matter of law to the defendant. However, this is not a case in which the harm resulted from a "concatentation of highly unusual circumstances" or "an extended sequence of improbable chance occurrences." *See McPherson*, 210 Or App at 618. Second, *Buchler* established "that the generic fact that criminals may commit crimes does not suffice to make the risk of a particular crime reasonably foreseeable for negligence purposes." *Stewart*, 245 Or App at 282. Again, plaintiff's theory is more than the generic fact that criminals may commit crimes. Plaintiff introduced evidence that would allow a reasonable factfinder to conclude that Beta Chapter knew that there was a specific risk of sexual assault during a party where alcohol was available, underage drinking was permitted, and access to private rooms was open.

Finally, we briefly address the dissent's discussion of the national statistic on alcohol-related sexual assault mentioned in Phi Psi's risk-management policy. The dissent contends that the "incomplete and generalized" national statistic of sexual assaults at fraternities nationwide is "misunderstood" and "insufficient" evidence, and rebukes our reliance on that statistic as evidence to support the conclusion that a reasonable factfinder could find that Beta Chapter knew that there was a reasonably foreseeable risk of sexual assault of plaintiff at the Halloween party. 273 Or App at 444-47 (DeVore, J., concurring in part and dissenting in part). The dissent incorrectly implies that that statistic was the only evidence on which we relied to conclude that foreseeability was a jury question. Regardless of the underlying validity of the statistic, it is but one piece of evidence that plaintiff introduced that created a factual question on foreseeability. Our conclusion is based on all of the evidence that Beta Chapter knew of the risk of sexual misconduct in the circumstances of the Halloween party, including Phi Psi's risk management policy (that included reference to the statistic at issue), computer-based training modules, and information from the Office of Greek Life. That evidence, viewed in the light most favorable to plaintiff, is enough to get plaintiff past summary judgment. The persuasiveness of that evidence, including the statistic, is for the jury to decide.

### b. Standard of Care

Defendants also appear to argue that, even if the risk of sexual assault was reasonably foreseeable, no objectively reasonable juror could have concluded that the chapter failed to take reasonable steps to protect its guests from third-party criminal conduct.[8] In other words, defendants are arguing that, as a matter of law, their conduct satisfied the applicable standard of care. In support, the chapter points to the measures that it took to police the Halloween party, including the hiring of outside security, the use of sober monitors, and the strict regulation of alcohol use in the common areas of the house by party attendees. The chapter also points out that, although the party was shut down early, the party inside the house was not "out of control," and alcohol was not served to minors or visibly intoxicated persons.

To the extent that Beta Chapter is arguing that no reasonable factfinder could find that the chapter's conduct violated the applicable standard of care, we reject that argument. Although the chapter certainly took numerous precautionary measures, it failed to take others—such as prohibiting access to private rooms during a party where alcohol use by underage members in private rooms was permitted and unmonitored—and a reasonable factfinder could view such measures as required under the applicable standard of care. As the Supreme Court stated in *Fazzolari*,

> "'[t]he jury is given a wide leeway in deciding whether the conduct in question falls above or below the standard of reasonable conduct deemed to have been set by the community. The court intervenes only when it can say that the actor's conduct clearly meets the standard or clearly falls below it.'"

303 Or at 18 (quoting *Stewart*, 255 Or at 607). We cannot say that defendants' conduct clearly meets the standard in this case; accordingly, that is a factual question for the factfinder to decide.

---

[8] In the briefing, Beta Chapter's standard-of-care argument is conflated with its argument as to whether its conduct unreasonably created a risk of the harm of the kind that plaintiff suffered. Those are distinct principles, and thus, by mixing them, the exact contours of the chapter's arguments are blurred.

Given our conclusion that the summary judgment record, when viewed in the light most favorable to plaintiff, contained factual questions on the issues framed by Beta Chapter's summary judgment motion—foreseeability of harm and the standard of care—the trial court erred by granting summary judgment and dismissing plaintiff's claims against Beta Chapter.

4. *Negligence Per Se*

Next, we address plaintiff's negligence *per se* count. To establish negligence *per se*, plaintiff must demonstrate that (1) defendants violated an administrative rule; (2) plaintiff was injured as a result of that violation; (3) plaintiff was a member of the class of persons meant to be protected by the rule; and (4) the injury plaintiff suffered is of a type that the rule was enacted to prevent. *McAlpine v. Multnomah County*, 131 Or App 136, 144, 883 P2d 869 (1994), *rev den*, 320 Or 507 (1995); *see also Ettinger v. Denny Chancler Equipment Co., Inc.*, 139 Or App 103, 107, 910 P2d 420 (1996) (noting that application of negligence *per se* based on a violation of administrative rules also requires that the rule not be *ultra vires*). Here, plaintiff asserted that negligence *per se* occurred because Beta Chapter violated *former* OAR 576-018-0240(2)(c) (June 30, 2010), *former* OAR 576-018-0250(2) and (3) (June 30, 2010), and *former* OAR 576-018-0260 (June 30, 2010)—rules that, at the time of the Halloween party, regulated alcohol distribution and consumption at "closed events" hosted by social organizations at OSU.

Beta Chapter moved for summary judgment against plaintiff's negligence *per se* count, arguing that, as a matter of law, because the rules on which plaintiff relied had been repealed after the date of the Halloween party, those repealed rules could not sustain plaintiff's negligence *per se* count. Alternatively, Beta Chapter asserted that, as a factual matter, there was no evidence that it had failed to comply with the rules that plaintiff cited for negligence *per se*. The trial court granted summary judgment on plaintiff's negligence *per se* count, although it did not explain why it did so.

Beta Chapter relied on our decision in *Greist v. Phillips*, 128 Or App 390, 875 P2d 1199 (1994), *rev'd in part*

*on other grounds*, 322 Or 281, 906 P2d 789 (1995), to argue to the trial court that, because the rules on which plaintiff relied had been repealed by the time of trial, those rules could not sustain plaintiff's negligence *per se* count. Beta Chapter asserted that the rules at issue were "merely procedural," and under *Greist*, changes to "merely procedural" rules can be applied "retroactively." In other words, because merely procedural changes can be applied retroactively, the repeal of those procedural rules after the assault in this case can be applied retroactively. Plaintiff disputes that position on appeal, arguing that the rules were not "merely procedural."

*Greist* involved a wrongful death action against the driver and owner of a truck that struck a vehicle in which the decedent infant was a passenger. 128 Or App at 393. One of the issues on appeal was whether the trial court erred by refusing to instruct the jury that, under the law as it stood at the time of trial, the plaintiff's failure to use the "required and available child restraint seat constituted negligence *per se*." *Id*. at 394-95. A statute in effect at the time of the accident required the use of child restraint seats, but also included a provision that violation of the statute "shall not be considered under any circumstances to be negligence nor shall evidence of such a violation be admissible in any civil action." ORS 811.210(3) (1989), *amended by* Or Laws 1991, ch 2, § 1. On appeal, we addressed whether a change in the statute (*i.e.*, an amendment eliminating subsection (3)) should be applied retroactively. The parties argued that, under existing Supreme Court precedent, whether the change should be applied retroactively depends on whether the change was procedural or substantive because "[c]hanges in law that affect substantive rights are not applied retroactively, but procedural changes can be." 128 Or App at 395 (citing *Joseph v. Lowery*, 261 Or 545, 547, 495 P2d 273 (1972)). We concluded that the statutory change was substantive and could not be applied retroactively. In particular, we noted that the amendment of ORS 811.210(3) "changed the rights and responsibilities of drivers in terms of their potential civil liability." *Id*. Accordingly, the law at the time of the accident controlled.

Here, the parties dispute whether the rules at issue were procedural or substantive in nature. Beta Chapter

argued to the trial court that the changes were procedural because they set out procedures "with which student groups were supposed to comply in order to host events involving alcohol." We disagree that the rules are merely procedural, and thus, we conclude that the trial court erred in granting summary judgment on that basis. In short, the rules relied on by plaintiff, at least in part, implicated the "rights and responsibilities" of student organizations in a substantive manner. For example, the rules provided that student organizations holding closed events with alcoholic beverages could be suspended if an underage person obtains or receives alcoholic beverages, including where the underage person obtains or receives alcohol in a private room during the event or as a result of the event. *Former* OAR 576-018-0250(2) (June 30, 2010).[9] In our view, rules that place limitations and requirements on a student organization—violation of which can result in suspension of the organization—cannot be properly characterized as "merely procedural." Accordingly, the repeal of the rules does not, as a matter of law, preclude plaintiff's negligence *per se* count.

We also briefly address Beta Chapter's alternative basis for summary judgment on the negligence *per se* count. In short, Beta Chapter argues that as a factual matter it "indisputably complied with the OARs," and alternatively, that even if Beta Chapter violated any of the rules "plaintiff cannot prove that [Beta Chapter] failed to act reasonably under the circumstances."

As for Beta Chapter's "indisputable" compliance with the rules, there is evidence in the summary judgment record that creates a question of fact on that issue. For example,

---

[9] Beta Chapter did not seek summary judgment on the basis that, as a matter of law, plaintiff was not injured as a result of any violation of the rules; that plaintiff was not a member of the class of person meant to be protected by the rules; or that the injury plaintiff suffered is not the type of injury the rules were enacted to prevent. *See McAlpine*, 131 Or App at 144 (setting forth the requirements a plaintiff must demonstrate to establish negligence *per se*). To the extent that Beta Chapter asserts on appeal that plaintiff could not show that her injury resulted from any violation of the rules, that contention was not made to the trial court and is not asserted as an alternative basis for affirmance; accordingly, we do not address it. Further, we express no opinion on whether summary judgment would have been appropriate on the other *McAlpine* requirements.

there is evidence from which a reasonable factfinder could find that Beta Chapter failed to control access to alcohol in private rooms, which would constitute a violation of *former* OAR 576-018-0250(2) (June 30, 2010). Accordingly, summary judgment was inappropriate.

Finally, we reject Beta Chapter's contention that, as a matter of law, plaintiff could not show that it "failed to act reasonably" given the precautions and security measure undertaken by the chapter. *See Bjorndal v. Weitman*, 344 Or 470, 477, 184 P3d 1115 (2008) (noting that Uniform Civil Jury Instruction 20.03 states that if "the defendant proves by a preponderance of the evidence that the defendant was acting as a reasonably careful person in the circumstances" negligence *per se* does not apply). For the same reasons that we rejected Beta Chapter's argument that, as a matter of law, it satisfied the standard of care, 273 Or App at 414, we reject Beta Chapter's argument that there is no question of fact that it acted reasonably in the circumstances.

B. *Phi Psi*

Next we address whether the trial court correctly granted summary judgment as to plaintiff's claim against Phi Psi. Plaintiff alleged that Phi Psi was vicariously liable under an agency theory—that Phi Psi had authority to control Beta Chapter and that, because of the agency relationship between the local chapter and the national organization, Phi Psi should be liable for Beta Chapter's negligence. Plaintiff also alleged a "negligent assumption of duty" theory against Phi Psi, contending that Phi Psi voluntarily undertook to provide supervision, control, and guidance to its local chapter members, including over member conduct in general and specifically with regard to responsible alcohol use and the prevention of sexual assault. Plaintiff claimed that Phi Psi negligently provided that supervision, control, and guidance because it failed to (1) monitor and enforce Beta Chapter's compliance with required rules of conduct relating to responsible alcohol use, underage drinking, and the prevention of sexual assault; (2) establish, monitor, and enforce rules to prohibit and prevent guest access to private rooms at Beta Chapter during social events where alcohol is "permitted, available, and possessed and allowed to be

consumed by members in private rooms"; and (3) establish, monitor, and enforce rules to prohibit possession and consumption of alcohol in private rooms of the chapter house during social events. We address each theory in turn.

### 1. *Vicarious Liability*

We begin with the applicable legal principles that govern nonemployee agency relationships. At common law, "agency" was defined as a relationship that "'results from the manifestation of consent by one person to another that the other shall act *on behalf and subject to his control,* and consent by the other so to act.'" *Vaughn v. First Transit, Inc.,* 346 Or 128, 135, 206 P3d 181 (2009) (quoting *Hampton Tree Farms, Inc. v. Jewett,* 320 Or 599, 617, 892 P2d 683 (1995) (emphasis in *Vaughn*)). "The agency relationship can arise either from actual consent (express or implied) or from the appearance of such consent." *Eads v. Borman,* 351 Or 729, 736, 277 P3d 503 (2012). "[T]he principal is bound by or otherwise responsible for the actual or apparent agent's acts only if the acts are within the scope of what the agent is actually or apparently authorized to do." *Id.* at 736. "[F]or a principal to be vicariously liable for the negligence of its nonemployee agents, there ordinarily must be a connection between the principal's 'right to control' the agent's actions and the specific conduct giving rise to the tort claim." *Vaughn,* 346 Or at 138. To impose vicarious liability for a nonemployee agent's physical conduct, the principal must have—or appear to have—a right to control how the act is performed—that is, the physical details of the manner of performance—that is characteristic of an employee-employer relationship. *Id.* at 139.

Phi Psi contended in its summary judgment motion that, under Oregon agency law, even if Beta Chapter is an agent of Phi Psi, it was not actually or apparently authorized by Phi Psi to do the "acts" that led to plaintiff's injuries. In addition, relying on Oregon cases, Phi Psi asserted that there was no evidence that any right of Phi Psi to control Beta Chapter's actions connected to the specific conduct that gave rise to plaintiff's negligence claims. Specifically, Phi Psi claims that the only evidence in the record was that it did not have day-to-day control over the local chapter or the

chapter's members' actions, and that it was those day-to-day actions that gave rise to plaintiff's claims.

On appeal, plaintiff argues that an agency relationship existed between Phi Psi and Beta Chapter based on Phi Psi's right to control intake, to suspend or expel members, and to revoke charters. Further, plaintiff asserts that the connection between Phi Psi's right to control Beta Chapter and Beta Chapter's negligent conduct is provided by evidence that Phi Psi imposed the risk-management policy on each chapter and required each chapter's officers to attend training on implementing the policy. Plaintiff maintains that, because the policy specifically addressed alcohol abuse and sexual assault, and the local chapter was not permitted to vary from those policies, Phi Psi's control over the chapter had a connection to the chapter's negligent failure to protect plaintiff from a foreseeable risk of alcohol-related sexual assault. Finally, plaintiff asserts that the documents that govern the relationship between Phi Psi and Beta Chapter gave Phi Psi control to grant, to suspend, or to revoke Beta Chapter's charter; the right to discipline individual members; and the right to appoint a committee to supervise the affairs of the chapter.

Thus, the issue framed below and on appeal is whether, on this record, a reasonable factfinder could find Phi Psi vicariously liable for the negligent conduct of Beta Chapter. Because defendants do not assert an absence of an agency relationship between Phi Psi and Beta Chapter, and because plaintiff acknowledges that the agency relationship between defendants is one of principal and nonemployee, the dispositive issue is whether there is sufficient evidence of a connection between Phi Psi's "right to control" Beta Chapter's actions and the specific conduct that gave rise to plaintiff's tort claim. *See Vaughn*, 346 Or at 138.

Before we address the summary judgment record here, we examine *Viado v. Domino's Pizza, LLC*, 230 Or App 531, 217 P3d 199 (2009), *rev den*, 347 Or 608 (2010), which is instructive to the issues in this case. In that case, the plaintiff sued Domino's Pizza and a Domino's franchisee to recover for injuries he sustained in an accident with the franchisee's pizza delivery driver. *Id.* at 533. The issue

on appeal was whether the plaintiff's evidence at the summary judgment stage would allow a reasonable juror to find Domino's vicariously liable for the driver's negligence. After concluding that there was a nonemployee agency relationship between the franchisee and Domino's, we examined whether there was a connection between Domino's right to control the franchisee's actions and the specific conduct giving rise to the tort claim. *Id.* at 550-51.

That inquiry involved deciding whether there was evidence that would allow a jury to find that Domino's had the right to control the physical details of the conduct that injured the plaintiff—*i.e.*, the manner in which the driver carried out his driving duties. The record contained evidence that Domino's asserted various "controls" over the franchisee's drivers, including standards for hiring and training them, standards for delivery vehicles, and general driving safety standards. *Id.* at 551. We concluded that, although those "controls" touched on the delivery process, "none of them gave Domino's the right to control *the physical details of the manner of driving.*" *Id.* (emphasis in original). We explained that "[s]etting * * * standards for a franchisee's employees and having the right to actually control how the franchisee's employees perform the physical details of driving are two different things." *Id.* at 552. Instead of establishing standards as to the physical details of driving, such as prescribing the route that the franchisee's employees must take, Domino's required only that its franchisee's drivers generally obey the rules of the road and drive safely. *Id.* at 552-53; *cf. Miller v. McDonald's Corp.*, 150 Or App 274, 281, 945 P2d 1107 (1997) (holding that the franchisor could be vicariously liable for negligent food handling and preparation by the franchisee's employees because the franchisor established the ways in which its franchisee handled and prepared food and enforced the use of those particular methods through regular inspections and the right to cancel the agreement). Accordingly, we concluded that a reasonable factfinder could not find that Domino's had the requisite control over the franchisee to make it vicariously liable for the actions of the franchisee's driver. *Viado*, 230 Or App at 553.

Although *Viado* involved an agency relationship between entities that was based on a franchise agreement,

our analysis in that case is instructive on the issue before us. Here, plaintiff asserted that Beta Chapter was negligent by, among other things, hosting a party where underage members could possess and consume alcohol in their private rooms and failing to prohibit access to private rooms. Accordingly, the ultimate question is whether a factfinder could conclude on this record, viewing the evidence in the light most favorable to plaintiff, that Phi Psi had the right to control the physical details of hosting and monitoring the Halloween party. We conclude that plaintiff's evidence falls short of creating a genuine issue of material fact on that question.

The evidence on which plaintiff relies—that Phi Psi had the right to control intake, to suspend or expel members, to revoke charters, and to impose fraternity-wide policies aimed at curbing alcohol abuse and preventing sexual assaults—is insufficient to support a finding that Phi Psi had the right to control Beta Chapter's day-to-day operations such as the physical details of hosting a Halloween party. Rather, the evidence establishes only that Phi Psi's powers, at least with respect to the type of day-to-day operations at issue here, were essentially remedial in nature. That is, Phi Psi could react to violations of its policies or to a chapter's misconduct with punishment but, similar to *Viado*, the policies were generalized standards that allowed day-to-day control over the functions of Beta Chapter to remain with the local chapter. Although Phi Psi had the authority to appoint a committee to supervise the affairs of the chapter, which might have included supervising day-to-day activities, there is no evidence that Phi Psi had done that in this case at the time of the Halloween party. Accordingly, we conclude that no reasonable factfinder could find that Phi Psi had the right to control the physical details of hosting and monitoring the Halloween party to the extent necessary to find Phi Psi vicariously liable.

2. *Direct Negligence*

Finally, we address plaintiff's negligence claim against Phi Psi. Our analysis is limited to the theory of negligence alleged by plaintiff against Phi Psi, as framed by defendants' summary judgment motion and the parties' arguments on appeal.

In her complaint, plaintiff alleged that Phi Psi "undertook to provide supervision, control, and guidance to its local chapter members" by providing advice, education, and rules of conduct aimed at responsible alcohol use and the prevention of sexual assault, and that Phi Psi negligently performed that role because it (1) failed to monitor Beta Chapter's compliance with the established rules regarding alcohol use and the prevention of sexual assault; (2) failed to establish, monitor, and enforce rules regarding guest access to private rooms during social events; and (3) failed to establish, monitor, and enforce rules that would prohibit the possession and consumption of alcohol in private rooms at the chapter house during social events.

At the summary judgment stage, plaintiff clarified that her negligence claim against Phi Psi was based on the rule set out in the *Restatement (Second) of Torts* section 323 (1965) that

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking if

"(a)   his failure to exercise such care increases the risk of such harm, or

"(b)   the harm is suffered because of the other's reliance upon the undertaking."

Plaintiff pointed to evidence that Phi Psi knew of the alcohol-related sexual assault problem at college fraternities, and undertook a training program to reduce the risk of liability for injuries resulting from alcohol use and sexual assault. In particular, plaintiff pointed to evidence that Phi Psi's Director of Expansion had visited Beta Chapter in 2008 and presented information about the fraternity's risk-management program, that Phi Psi had developed a handbook that was designed to, among other things, provide chapter members with information about alcohol abuse and sexual assault, that Phi Psi required the local chapter to adopt the national risk-management policies, and finally, that Phi Psi's bylaws require a chapter advisor who was supposed to

give guidance to local chapters. As such, plaintiff contended that there was evidence that Phi Psi "assumed a role to control alcohol abuse and sexual assaults," and that it assumed an obligation to do so in a non-negligent manner.

Phi Psi argued that it was entitled to summary judgment on plaintiff's direct negligence claim because (1) there was no evidence that Phi Psi had assumed a duty *to plaintiff*; (2) as to any duty Phi Psi assumed to Beta Chapter, there was no evidence that Phi Psi had negligently performed any of the services that it undertook; and (3) plaintiff did not allege, nor could she prove, that Phi Psi's conduct had unreasonably created a foreseeable risk of sexual assault to her.

We begin with the first issue raised by Phi Psi on summary judgment—that the authority on which plaintiff relied does not establish that Phi Psi had a duty to plaintiff.[10] In its motion, and again on appeal, Phi Psi asserted that plaintiff's claim under the rule stated in *Restatement* section 323 fails as a matter of law because, even if there is evidence that Phi Psi assumed a duty to the local chapter to "control alcohol abuse and sexual assault," *Restatement* section 323 does not recognize a duty to a third party such as plaintiff. That is, under *Restatement* section 323, if Phi Psi undertook to render services to the local chapter as plaintiff alleges, it can only be "subject to liability to [the local chapter members] for physical harm resulting from [Phi Psi's] failure to exercise reasonable care" in the undertaking, and that there is no evidence that Phi Psi undertook any duty directly to plaintiff.

---

[10] As the Supreme Court recently reiterated in *Towe*, the traditional duty-breach analysis is often, but not always, subsumed in the concept of reasonable foreseeability. 357 Or at 86. We note that plaintiff has not pursued a negligence claim against Phi Psi on a "general foreseeability" theory. *Cf. Fraker v. Benton County Sheriff's Office*, 214 Or App 473, 487, 166 P3d 1137 (2007) (where the plaintiffs argue that the evidence would have allowed a jury to find the defendant liable to them under either a special relationship or a general foreseeability theory, we first consider whether a special status, relationship or standard of care exists, and if not, we then determine whether the defendant could be found liable under a general foreseeability theory). Here, plaintiff has argued only that Phi Psi's duty is founded in the rule stated in *Restatement* section 323, and accordingly, we do not address the viability of a general foreseeability theory against Phi Psi on this record.

We agree with defendants that *Restatement* section 323 does not cover liability to third parties that are harmed by a negligent voluntary undertaking. The section is clear that it addresses liability for harm to "the other" for which the voluntary undertaking was taken. And, at least in this case, plaintiff alleged only that Phi Psi had voluntarily undertaken a duty to the local chapter and its members.

Plaintiff disagrees, citing our decision in *Peterson v. Mult. Co. Sch. Dist. No. 1*, 64 Or App 81, 668 P2d 385, *rev den*, 295 Or 773 (1983). In that case, the plaintiff sued a number of parties, including the Oregon School Activities Association (OSAA), after he was rendered quadriplegic as a result of an injury that he suffered at a school preseason football practice. As to OSAA, he alleged that the organization was negligent "for failing to require or recommend that member schools undertake various training and safety measures and that they not permit live tackling during the first week of practice or 'tackling with the head.'" *Id.* at 83. OSAA, a private nonprofit corporation that "performs certain functions in connection with competitive sports among member schools," had neglected to adopt or disseminate a national organization's safety recommendations regarding preseason football practices. *Id.* at 83-84. A jury found that OSAA was negligent and liable to the plaintiff.

On appeal, one of the issues was whether the court had incorrectly instructed the jury that, if OSAA "voluntarily undertook to regulate the matters alleged in the Plaintiff's complaint, that is, regarding practice and what you did at practice, * * * then they would have the responsibility to act reasonably in that regard, and would be liable for negligence in failing to act reasonably." *Id.* at 92. OSAA argued that the instruction was legally incorrect because "the claimed negligence * * * was not an act of commission but an act of omission." *Id.* at 93. Citing *Restatement* section 323 we explained:

> "Assuming without deciding that the undertaking to act must always be affirmative in order for a volunteer to have a duty, once the duty is undertaken it can be breached by a negligent *failure* to perform, as well as by negligent performance. There was ample evidence from which the jury

could find that OSAA voluntarily undertook to make safety recommendations or to disseminate the safety recommendations of others to the schools and that its failure to follow that practice with respect to the [national organization's] recommendations was negligent."

*Id.* at 94 (emphasis in original). Accordingly, we rejected OSAA's assignment of error challenging the jury instruction, and affirmed the jury's verdict.

Plaintiff argues that *Peterson* stands for the proposition that a duty "to another" assumed under *Restatement* section 323 also covers liability for injuries sustained by a third party, such as the student athlete in *Peterson*. We disagree. There is no indication in *Peterson* that the discrete issue argued by the parties in this case—whether a duty voluntarily assumed under *Restatement* section 323 includes liability to third parties—was put at issue by OSAA or decided by us. Rather, we resolved a narrow assignment of error aimed at the trial court's jury instruction. Accordingly, we reject plaintiff's argument that *Peterson* controls in this case.

Plaintiff, in her reply brief, cites to *Restatement* section 324A as additional support for her argument. That provision addresses liability to third persons for the negligent performance of an undertaking:

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

"(a)   his failure to exercise reasonable care increases the risk of such harm, or

"(b)   he has undertaken to perform a duty owed by the other to the third person, or

"(c)   the harm is suffered because of reliance of the other or the third person upon the undertaking."

The problem with plaintiff's reliance on *Restatement* section 324A, at least at this stage in the proceedings, is that plaintiff is raising it for the first time on appeal. Plaintiff's

argument to the trial court was focused on Phi Psi's voluntary undertaking to supervise and control *the local chapter*, and never linked that voluntary undertaking to the rule stated in *Restatement* section 324A, *i.e.*, that Phi Psi, by voluntarily undertaking to render services to the local chapter members should have recognized that that undertaking was necessary for the protection of plaintiff and that Phi Psi's failure to exercise reasonable care in its undertaking increased the risk of harm to plaintiff.

We conclude that plaintiff's argument that *Restatement* section 324A imposes liability on Phi Psi is unpreserved. Plaintiff and defendants squared off on summary judgment exclusively over the assumption of a duty based on *Restatement* section 323. Plaintiff's failure to argue to the trial court the related theory that a voluntary undertaking for *another* can support liability as to a *third party* when the circumstances in *Restatement* section 324A are met, failed to satisfy the preservation rule's prudential purpose of giving "a trial court the chance to consider and rule on a contention, thereby possibly avoiding an error altogether or correcting one already made, which in turn may obviate the need for an appeal." *Peeples v. Lampert*, 345 Or 209, 219, 191 P3d 637 (2008). It also failed to satisfy a pragmatic purpose of the preservation rule to ensure fairness to opposing parties by requiring that "the positions of the parties are presented clearly to the initial tribunal" so that "parties are not taken by surprise, misled, or denied opportunities to meet an argument." *Davis v. O'Brien*, 320 Or 729, 737, 891 P2d 1307 (1995). To analyze plaintiff's claim against Phi Psi under *Restatement* section 324A would be inappropriate under these circumstances.

Because it was not presented below, we do not address whether plaintiff's direct negligence claim against Phi Psi could have avoided summary judgment under general foreseeability principles, and because it was not preserved, we do not decide whether a claim under the principles in *Restatement* section 324A could have avoided summary judgment on this record. We simply conclude that the trial court did not err in granting summary judgment against plaintiff's claim under *Restatement* section 323.

## III.   CONCLUSION

In summary, we conclude that the trial court erred by dismissing plaintiff's negligence claim against Beta Chapter on summary judgment, but correctly granted summary judgment to Phi Psi.

Judgment in favor of Oregon Beta Chapter of Phi Kappa Psi Fraternity reversed and remanded; otherwise affirmed.

**DEVORE, J.,** concurring in part, dissenting in part.

This case considers the circles of blame for the criminal act of another person. When an injured plaintiff asks a court to hold a defendant financially liable for the criminal act of a third person, Oregon law has a test to decide whether the defendant shares blame. It is a test of general foreseeability, but, when a third person inflicted the injury, it is a test with a sharper focus. It is a test that considers the risk of a particular, violent person or of a location made unsafe by the violence of others. Did the defendant, who is to be faulted for the act of another person, actually know or have reason to know of the specific danger to the plaintiff posed by this third person or by an unknown person at this location?

I write separately, concurring with most of the majority's analysis. I do not disagree with the majority's disposition of the claim against the national fraternity. Nor do I disagree with the majority's remand for further proceedings on the claim against the Beta Chapter for negligence *per se* based on the prospect of violation of former Oregon Administrative Rules. The defendant's argument on appeal that plaintiff "could not show that her injury resulted from any [OAR] violation" was not made to the trial court in terms of an inability to show that she was in the class of persons meant to be protected by a rule or that a sexual assault was not the sort of injury that alcohol regulations were intended to prevent. *Compare McAlpine v. Multnomah County*, 131 Or App 136, 144, 883 P2d 869 (1994), *rev den*, 320 Or 507 (1995) (cited by the Beta Chapter to the trial court and this court; listing four requisites for negligence *per se*), *with Gattman*

*v. Favro*, 306 Or 11, 24, 757 P2d 402 (1988) (assault victim was not within the class of persons intended to be protected by liquor liability statute). Although the trial court did not explain the reason for its dismissal of the negligence *per se* claim, this court does not address new reasons on appeal, which were not developed and which, if squarely addressed, could have led to a different record. *See Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 659-60, 20 P3d 180 (2001) (examining the "right for the wrong reason" review of a summary judgment). Unaddressed reasons remain undecided.

As to the claim of ordinary negligence, I dissent to suggest that our case law requires more than plaintiff offers to hold the Beta Chapter liable. To have "facilitated" a crime, by having carelessly provided a setting or having made the crime more likely, does not mean, without more, that the defendant had reason to foresee the crime and thereby become liable. Beyond that setting, the national statistic, to which plaintiff's claim reduces, does not mean what it might appear to mean, and it is insufficient evidence as a matter of law. To add that misunderstood and inadequate statistic to this setting does not mean that the local fraternity had reason to foresee the crime and become liable for it.

## I.  LIABILITY FOR ANOTHER'S INTENTIONAL ACT

### A.  *Prototype Precedents*

Two principal cases not only typify the lines of cases on an unsafe person or location, they are the modern source of Oregon's law of negligence. In *Fazzolari v. Portland School Dist. No. 1J*, 303 Or 1, 734 P2d 1326 (1987), a high school student, while waiting before school, was beaten and raped by an unknown assailant. Only 15 days beforehand, another woman had been sexually assaulted on the same school grounds. *Id.* at 21. The plaintiff attempted to introduce evidence of other incidents. The plaintiff alleged, among other things, that the school district had failed to warn and to provide security personnel when the district knew of previous similar attacks. The Supreme Court explained that the special duty of a school toward its students "*does* mean that negligence toward a student is tested by an obligation

of reasonable precautions against foreseeable risks *beyond* those that might apply to other persons."[1] *Id.* at 20 (emphases added). Given the prior attack or attacks at that location, the court held that the risk of sexual assault was foreseeable and that dismissal on a motion for a directed verdict was error. *Id.* at 22. Although the case involved a special and perhaps higher duty, the fact pattern typified that in which later negligence cases could find potential liability for a location made unsafe by the risk of third-party violence.

In *Buchler v. Oregon Corrections Div.*, 316 Or 499, 853 P2d 798 (1993), a prisoner escaped from custody, found keys in a state van, stole a gun from his mother's home, and shot two people two days later 50 miles away. The plaintiffs alleged, among other things, the state's negligence in failing to give warning of the escape to the public and especially to the plaintiffs' neighborhood. The Supreme Court evaluated the allegation of fault involving the van keys and the failure to warn in terms of ordinary negligence or general foreseeability, not a special duty. *Id.* at 504-05.

The court began by rejecting the possibility that liability would follow from simply "facilitating" the harmful act, a distinction that is critical to the case at hand. *Id.* at 510. Previously, in *Kimbler v. Stillwell*, 303 Or 23, 734 P2d 1344 (1987), the court had reinstated the plaintiff's claim of negligence for a store's failure to lock a gun display case, which led to a thief's use of the gun to inflict injury later. *Buchler* overruled *Kimbler*, explaining that a defendant should not face liability simply because a defendant is involved in the chain of events—even those without which the death or injury would not have occurred. The court elaborated:

> "While it is generally foreseeable that criminals may commit crimes and that prisoners may escape and engage in criminal activity while at large, that level of foreseeability does not make the criminal's acts the legal responsibility of everyone who may have contributed in some way to the criminal opportunity. In other words, in our society it is

---

[1] Speaking of cases without a special duty, the court commented that "the issue of liability for harm actually resulting from defendant's conduct properly depends on whether that conduct unreasonably created a foreseeable risk to a protected interest of the kind of harm that befell the plaintiff." *Fazzolari*, 303 Or at 17.

foreseeable that crimes may occur and that the criminals perpetrating them may cause harm. Thus, in a general sense, it is foreseeable that anyone whose conduct may in any way facilitate the criminal in committing the crime has played some part in the resulting harm. But *mere 'facilitation' of an unintended adverse result, where intervening intentional criminality of another person is the harm-producing force, does not cause the harm so as to support liability for it."*

316 Or at 511-12 (emphasis added). The *Buchler* court considered the state's carelessness in leaving the keys in the van within the chain of causation, but, ultimately, deemed it not to be actionable, like the store's failure to lock the gun case in *Kimbler*. The court concluded that the "generalized foreseeability principle" did not reach so far.

To find the defendant liable for the intentional act of a third person, the court required more than "facilitation" of the crime. The court required "evidence that defendant here either knew [or] had reason to know of the *specific danger* presented by the prisoner to plaintiffs." *Id.* at 516 (emphasis added). Liability did not turn on hindsight, nor the perspective of an all-knowing "reasonable person." Liability turned on what this particular defendant knew or had reason to know. The prisoner's history gave the state no indication of violent crimes. The plaintiffs had not shown why the state should have known the prisoner would be near the plaintiffs, should have known where the prisoner's mother lived, and should have known he would have stolen a gun. The court concluded that the state had "no duty to warn in the absence of [the] knowledge" of the specific danger presented to the plaintiffs by the prisoner. *Id.* The court affirmed a dismissal on summary judgment. Although *Buchler* dismissed the claims, its fact pattern typified which negligence cases *could*, with something more, find a defendant liable for the risk of a third person's violence.

## B. *Liability for a Dangerous Person*

Two lines of cases, involving a defendant's liability either for a dangerous person or an unsafe location, resemble these two prototype cases, and both lines of cases contribute to the answer to the case at hand. I draw first from the cases

on a dangerous person, then draw on cases on an unsafe location, before turning to the facts at hand, and, as to the local fraternity, disagreeing with the majority's conclusion.

The fact patterns with dangerous third parties often involve alcohol, robbery, assault, and sexual violence. The decisions caution courts against making easy assumptions. In several cases involving alcohol, it did not suffice to allege that serving alcohol to an intoxicated person gave reason for a defendant to foresee that a third person would intentionally assault someone. In *Moore v. Willis*, 307 Or 254, 260, 767 P2d 62 (1988), the Supreme Court declared:

> "The fact that someone is visibly intoxicated or underage, standing alone, does not make it foreseeable that serving alcohol to the person creates an unreasonable risk that the person will become violent."

The court affirmed a judgment on the pleadings in favor of two tavern owners after a patron drew a gun and killed a taxi driver.

In *Sparks v. Warren*, 122 Or App 136, 856 P2d 337 (1993), it did not suffice to allege that a fraternity failed to regulate the use of alcohol by its members and knew or should have known that underage drinkers frequently become abusive and violent. The plaintiff was assaulted by a fraternity member after drinking there and at a tavern. We responded:

> "The risk flowing from the negligence alleged here is not that a minor will drink but that someone predictably will be exposed to danger of an assault if defendants were negligent as alleged."

*Id.* at 140. Because the plaintiff had failed to present evidence that the violence was foreseeable, we affirmed summary judgment for the defendants.

Recently, in *Chapman v. Mayfield*, 263 Or App 528, 329 P3d 12, *rev allowed*, 356 Or 400 (2014), a fraternal lodge was alleged to have served a visibly intoxicated patron. The patron shot and injured two men, who sued the lodge and others. We recalled that,

> "to establish foreseeability, a plaintiff must first plead and then prove *specific facts*—beyond the fact of visible

intoxication—from which an objectively reasonable fact-finder could find or reasonably infer that the tavern owner who served the visibly intoxicated person *knew or had reason to know* that serving that person created the unreasonable risk that that person *would become violent.*"

*Id.* at 531 (emphases added). Like Sako in the case at hand, the lodge did not know any "specific facts" about the patron, which would have made violence foreseeable. Like the Beta Chapter here, the lodge had suffered no prior incidents in which patrons, to whom the lodge had served alcohol, had become violent. And, like plaintiff here, the plaintiff in *Chapman* offered only generalized information. A medical doctor testified that "[i]ntoxicated drinkers frequently become violent," and a bartender from a different bar testified that, when a patron becomes violent, "[t]hat's the alcohol talking." *Id.* at 532, 546.

We held "that evidence is insufficient to permit a rational factfinder to make the finding," which the law requires, that the defendant, just by being in the alcohol business, had reason to foresee that serving an intoxicated patron would pose an unreasonable risk of violence. *Id.* at 533. The generalizations, whether from a doctor or a bartender, did not suffice to prevent summary judgment for the defendant, because "too many intermediate inferences and assumptions" or "guesswork" would be required to find that the defendant had knowledge or reason to know the risk from this patron.[2] *Id.* at 535. *See also Allstate Ins. Co. v. Tenant Screening Services, Inc.*, 140 Or App 41, 914 P2d 16 (1996) (nothing in the mixed criminal record of a tenant/security guard "foreshadowed his particular crimes," *i.e.*, violent crimes of sexual assault and sodomy, so as to state a claim for liability against a tenant-screening service that had reported a clean record).

In contrast to the alcohol cases from *Moore* to *Chapman*, the outcome favors the plaintiff when the plaintiff offers some evidence that the defendant knew or had

---

[2] In *Chapman*, we recognized that ordinarily foreseeability is a jury question but noted that that principle "is not a rule of law, it is a rule of thumb." 263 Or App at 537. It is guidance that "affords the least guidance where, as here, the Supreme Court has articulated with some precision what facts a plaintiff must prove in order to establish foreseeability." *Id.* at 537.

reason to know the "specific danger" that a third person presented to plaintiff. *See Buchler*, 316 Or at 515 (no knowledge of specific danger to plaintiffs). For example, in *Brown v. Washington County*, 163 Or App 362, 987 P2d 1254 (1999), *rev den*, 331 Or 191 (2000), an inmate escaped from a corrections center and killed his brother. The defendant county knew that the inmate had a violent history, was agitated just before his escape, used his wife's address as his address, suspected her of an adulterous affair, and likely would go to her address. Yet, the county failed to warn anyone at the address of his escape. Such knowledge of the specific threat posed by a third person permitted the possibility of liability. *See also Washa v. DOC*, 159 Or App 207, 979 P2d 273 (1999), *aff'd by an equally divided court*, 335 Or 403, 69 P3d 1232 (2003) (the defendant, who inadequately supervised a parolee, was well aware of the parolee's violent assaults on women and the risk that he would remain "a potential mutilator and killer of women," such that the defendant had reason to have foreseen the risk of two rapes and a murder).

In *McAlpine v. Multnomah County*, 166 Or App 472, 999 P2d 522 (2000), *rev den*, 336 Or 60 (2008), a parole officer knew or had reason to know that the parolee had a history of violent offenses, including possession of a gas bomb, armed robbery, and assault and knew that he had committed new offenses, but failed to issue an updated parole report, allowing the parolee to be released. The plaintiff was subsequently injured in a traffic-related altercation with the parolee. The allegation of such knowledge permitted the county's potential liability for the parolee's conduct. *See also Panpat v. Owens-Brockway Glass Container*, 188 Or App 384, 394-95, 71 P3d 553 (2003) (the employer knew it had an employee with an explosive disorder, that he was not authorized to return to work without a mental health evaluation, and that the employee had twice engaged in obscene verbal confrontations with the victim).[3]

---

[3] This line of cases involving specific knowledge of a dangerous person has extended to the negligence of an off-duty employee. The employer's knowledge of an overworked employee's schedule permitted the possibility of liability, when the weary, off-duty employee was involved in an auto accident. *Faverty v. McDonald's Restaurants of Oregon, Inc.*, 133 Or App 514, 525-26, 892 P2d 703 (1995), *rev dismissed*, 326 Or 530 (1998) (the employer "knew or had reason to know of the number of hours [the employee] had been working").

## C. *Liability for an Unsafe Location*

These cases involving a dangerous third person parallel the cases involving a location made unsafe by unknown persons. There is a similar requisite in common: In location cases, liability can arise when the defendant knew or had reason to know from *specific evidence* that the location presented a risk of criminal harm or violence from third persons, even if the identity of the bad actor could not have been foreseen. Two early cases, with contrasting outcomes, illustrate that local experience is the specific evidence needed. Two recent cases, with contrasting outcomes, will sharpen our focus.

In *Uihlein v. Albertson's, Inc.*, 282 Or 631, 580 P2d 1014 (1978), a supermarket shopper was assaulted and her pocketbook stolen by an unknown assailant. She alleged a lack of security, argued the market was in a high-crime area in Portland, and relied on the comment of the store's former manager that it was the "roughest store" at which he had ever worked. The Supreme Court, however, found no evidence in the record about the other stores where the former manager had worked, which would give his statement context and probative value. *Id.* at 636. The only evidence of a "high crime rate" was shoplifting at the store. In the prior couple years, the store had suffered no prior incident of robbery or assault on its premises. The court concluded that the defendant did not know or have reason to know of the likelihood of the harmful acts of the kind the plaintiff suffered. *Id.* at 640-41. Summary judgment for the defendant was affirmed.

More specific evidence concerning the location produced a different outcome in *Brown v. J. C. Penney Co.*, 297 Or 695, 688 P2d 811 (1984) (*J. C. Penney*). A customer was attacked and robbed of her purse in the parking lot of the defendants' shopping center in Eugene. She alleged inadequate security and offered evidence of 268 incidents of criminal activity in the immediate vicinity in the prior six-month period. The shopping center knew of the incidents and acted on the reports in allocating security forces. Because the defendant had actual knowledge or reason to know of the risk—a risk specific to the location—the court affirmed the judgment for the plaintiff. *Id.* at 710.

Subsequent cases illustrate the same point. *See McPherson v. Oregon Dept. of Corrections*, 210 Or App 602, 617-18, 152 P3d 918 (2007) (defendant had reason to know of risk of assault of son and sexual assault of mother in apartment laundry building when defendant knew neighborhood was unsafe, neighborhood had 86 emergency calls to police in nine years, and apartment managers had called police about problems, including vandalism and trespass in the laundry building); *Sande v. City of Portland*, 185 Or App 262, 271-72, 59 P3d 595 (2002) (given repeated assaults and robberies of lone victims by a "mountain-bike" assailant, the city had reason to foresee harm to plaintiff from its instruction to neighbor not to warn plaintiff).[4]

A more recent pair of contrasting cases provide a sharper focus for this case. In *Stewart v. Kids Incorporated of Dallas, OR*, 245 Or App 267, 261 P3d 1272 (2011), *rev dismissed as improvidently allowed*, 353 Or 104 (2012), a 13-year-old girl, volunteering at a car wash at a Dairy Queen restaurant, was forced into the men's restroom and sexually assaulted. Her guardian *ad litem* alleged that the carwash sponsor and restaurant were negligent and had reason to foresee that sexual predators would be attracted to a carwash with teenage girls participating. We found the plaintiff's theory no different in essence than the "discredited theory in *Kimbler*" that, because criminals are likely to steal guns and harm people, the failure to secure a gun display created a foreseeable risk. *Id.* at 284. We rejected the plaintiff's argument that the "'place or character' of the Dairy Queen" (where youth could be found) permitted a reasonable inference of risk. *Id.* at 285. Finding nothing more than a "theoretical possibility" of sexual assault at that location, we affirmed dismissal for failure to state a claim. *Id.* at 286.

---

[4] In a variation on the unsafe location theme, the defendant's summary judgment was reversed in *Cunningham v. Happy Palace, Inc.*, 157 Or App 334, 970 P2d 669 (1998), *rev den*, 328 Or 365 (1999). Late at night, the defendant's bouncer prevented the intoxicated plaintiff from calling her daughter for a ride home and instead left her outside, impaired, and vulnerable. Forced to hitchhike, she was picked up and raped by three men. We concluded that a jury could find that the defendant had reason to foresee that forcing the plaintiff to leave the safety of the restaurant before she could make her call and abandoning her outside, at night, and impaired, placed her at a risk of criminal assault.

In *Piazza v. Kellim*, 271 Or App 490, 354 P3d 698 (2015), a 17-year-old student was fatally shot while waiting in line outside an underage nightclub in the "Old Town/Chinatown neighborhood" in downtown Portland. The shooter was mentally ill and had gone to the "nightclub looking to shoot 'preppies' or 'pop tweens.'" *Id.* at 492. Seven years before, a shooter had fired into a crowd at the same location, and there had been a history of fights and assaults in line outside the nightclub. The surrounding neighborhood, the plaintiff alleged, was "plagued" by recurrent violence and gang activity. *Id.* at 494. Managers of local bars, including the defendant, attended a police "summit" to reduce violence. *Id.* The plaintiff alleged that the nightclub defendants had failed to take reasonable measures to protect customers from the criminal acts of third parties.[5] The trial court dismissed the case, under ORCP 21 A(8), for failure to state a claim. On appeal, we stressed the requisite for a defendant's liability for an unsafe location, explaining that

> "a plaintiff must allege facts demonstrating that the harm by third-party criminal conduct was foreseeable *to the defendant in a concrete way* and may not rely on the abstract proposition that 'crimes may occur and that the criminals perpetrating them may cause harm.'"

*Piazza*, 271 Or App at 504 (quoting *Buchler*, 316 Or at 511-12) (emphasis added). We distinguished *Stewart* because that plaintiff had failed to "allege *specific factual support*— as opposed to relying on generalized abstractions about the existence of criminal activity." *Id.* at 506 (emphasis in original). In *Piazza*, the plaintiff had alleged that the defendants knew the alleged criminal activity in the vicinity and at the specific location. We concluded that, for the purpose of stating a claim, a jury could find "the prior physical assaults at or around" the nightclub to be "similar enough" so as give the nightclub defendants reason to have foreseen the shooting. *Id.* at 511.[6]

---

[5] Certain Rotary defendants, sponsors of the international exchange program in which the student participated, were also named defendants.

[6] Dissenting, a member of this court was unpersuaded that the incidents at or around the nightclub gave the nightclub defendants reason to foresee the incident. *Id.* 271 Or App at 520 (Edmonds, S. J., dissenting).

## II.   LIABILITY OF THE BETA CHAPTER

If the principles of these cases were applied to the facts here, the majority should have concluded that plaintiff has failed to offer evidence that the local fraternity knew or had reason to know of an unreasonable risk to plaintiff from a dangerous person or an unsafe location. Each alternative requires separate discussion.

A.   *No Knowledge or Reason to Know of a Dangerous Person*

The majority opinion recites, and plaintiff concedes, that there was no evidence that the Beta Chapter had reason to know that Sako had a propensity for violence. Without contradiction, Gerritz, who was the chapter president at the time of the party, declared, "Mr. Sako had no known prior sexual assault record or any history of becoming violent with or without the influence of alcohol." Absent any reason to know that Sako might assault plaintiff or another person, the chapter could not become liable, under the first line of cases, for the intentional or criminal act of a person who the chapter knew or should have known was dangerous. *See Moore*, 307 Or at 261 (claim dismissed); *Sparks*, 122 Or App at 140 (claim dismissed). This is doubly true because, unlike several of the cases reviewed above, the Beta Chapter did not serve him alcohol when he was visibly intoxicated; it did not serve him any alcohol at all. *See Moore*, 307 Or at 261 (where liability for another's violence does not follow even from serving someone who is visibly intoxicated). Under the first line of precedents, the local fraternity cannot be held liable for a specific "dangerous person," even for allowing an underage member to possess his own alcohol or, by logical extension, to bring a guest to his room, when Sako had no history of assault or threatening misbehavior. *See Moore*, 307 Or at 260-61 (intoxicated or underaged drinker); *Sparks*, 122 Or App at 140 (fraternity drinker). The Beta Chapter lacked the requisite reason to know any "specific danger" that this particular person presented to plaintiff. *Buchler*, 316 Or at 516 (requiring defendant to know specific facts of threat of violence); *Chapman*, 263 Or App at 532 (need for specific facts showing risk of violence from this intoxicated person); *see also Brown*, 163 Or at 362 (liability

where threat of person known); *McAlpine*, 166 Or App at 472 (same).

## B. *No Knowledge or Reason to Know of an Unsafe Location*

The majority is quite right to the extent it observes that "a risk of third-party criminal conduct" is not limited to "a defendant's knowledge of a specific perpetrator's propensity for violence." 273 Or App at 404 (referring, however, to the propensity for violence of "Sako or *other* chapter members" (emphasis added)). But the precedent that the majority cites for broader liability is an early case, predating *Buchler* and involving a hazardous location, a bank's night depository. *Torres v. United States Nat. Bank*, 65 Or App 207, 670 P2d 230, *rev den*, 296 Or 237 (1983). It was a claim initially dismissed at the pleading stage but reversed on appeal to allow the plaintiff to offer evidence of other robberies of night depositories on the street or in the area. *Id.* at 214.

Even at that, *Torres* drew a dissent, contending what later cases taught. The dissent declared that "[p]laintiff should have pleaded with specificity that defendant knew, or should have known, that in the past [the] patrons at the 72nd and Fremont Branch had been robbed or assaulted while using the night depository." *Id.* at 216 (Van Hoomissen, J., dissenting); *see, e.g., Stewart*, 245 Or App at 284 (criminal threat to teen carwash). Regardless of the difference in majority or dissenting views, both views in *Torres* contemplated that, ultimately, a plaintiff must show specific evidence from the experience of the locale to demonstrate that a particular location was made unsafe by unknown third parties. Such localized specificity is what the complaint in *Piazza* illustrated. As it was, *Torres* was only an early-stage, pleading case. After *Buchler* and the parallel line of location cases, *Torres* cannot be read to permit a defendant's liability for providing a setting at which the general risk of crime might be realized, when no local history foretells the risk.

Unlike *Torres*, the case at hand is not a pleading case. Defendant's evidence challenged plaintiff to offer evidence to create a dispute of fact to show that the local fraternity was a location known or knowable by the local fraternity

to be hazardous from past experience. *See J. C. Penney*, 297 Or 695; *Uihlein*, 282 Or at 631; *Stewart*, 245 Or App at 267; *McPherson*, 210 Or App at 605-06 (risk of criminal activity at location). To borrow from *Piazza*, a more recent unsafe-location case, this plaintiff must have responded with facts demonstrating that the risk of a hazardous location "was foreseeable to the defendant in a concrete way" and not by reference to the general risk of such crime. *Piazza*, 271 Or App at 504 (citing *Buchler*, 316 Or at 511-12).[7]

Prior to this incident, there is no evidence whatsoever of sexual assault at the Beta Chapter. Gerritz recounted, "To my knowledge, the sexual assault committed by Mr. Sako during the event was the first and only known sexual assault to have occurred at the Phi Psi House and/or to have involved Mr. Sako or any other member of the Local Chapter." Collinsworth, the executive director of the national fraternity organization, confirmed the same fact. Plaintiff offered no evidence of any violence of any kind at the local fraternity and, for that matter, no evidence of any sexual assault at fraternities, sororities, or dormitories at Oregon State University. Absent any evidence to dispute the Gerritz or Collinsworth reports, plaintiff failed to offer "specific facts" to show that the local fraternity knew or had reason to know from its experience that its location threatened plaintiff with an unreasonable risk of criminal assault. *See Buchler*, 316 Or at 515-16 (dangerous person risk); *Moore*, 307 Or at 261 (alcohol risk of violence); *Uihlein*, 282 Or at 640 (dangerous location risk); *Sparks*, 122 Or App at 140 (alcohol risk of violence). Under the line of cases involving a defendant's liability for an unsafe location, the Beta Chapter should not be found liable for contributing to an unsafe location, when no "specific facts," such as incidents at or around the fraternity, gave the Beta Chapter reason to foresee a sexual assault by an unexpected or unknown assailant.

---

[7] The majority borrows instead from *Chapman*, a dangerous person case, to set up the majority's proposition that this rape should have been foreseeable to the local fraternity by reason of its training about the general risk of alcohol-related misconduct. The majority holds that, notwithstanding *Buchler* or *Moore*, defendant's imagined knowledge of the general risk of alcohol-related assault satisfies foreseeability to render a defendant liable for facilitating this crime. 273 Or App at 405-06.

## III. DIFFERING VIEWS

### A. *Evidence Distinguished*

The majority reaches a different conclusion, but our difference of opinion is not due to defense arguments that the local fraternity employed so many measures to manage the party. I concur with the majority's rejection of those arguments on this issue of law. It is certainly true that the Beta Chapter followed the advice of the national fraternity by *not* furnishing alcohol at the party. Participants were required to bring their own beer, check it at the bar, and retrieve one beer at a time after showing proof of age. Four fraternity members served as "sober monitors," and two security guards helped supervise the party. When circumstances *outside* the house became questionable, the fraternity shut down the party early.

Although those precautions would reduce the risk of misbehavior, they are simply evidence, albeit significant evidence, for a jury's ultimate evaluation of the facts when deciding whether, all in all, the Beta Chapter breached its duty of care. Those precautionary measures may reduce some of the reasons that the Beta Chapter could foresee sexual assault in common areas, but those measures do not resolve foreseeability as a matter of law when the local fraternity allowed members to possess alcohol and invite guests into their rooms. I concur with the majority in distinguishing such evidence and leaving its significance for a jury.[8]

### B. *Evidence Misconstrued*

Where I respectfully disagree with the majority is in evaluating two matters: (1) the role of the setting and

---

[8] Because it reverses, the majority opinion does not address the declaration of plaintiff's counsel that plaintiff retained an expert to support the claims. Plaintiff indicated that the expert would testify that the fraternity breached a duty of care. Because the critical issue is what the Beta Chapter knew or had reason to know, and, because witnesses were deposed and provided concrete information on what the local fraternity knew or had reason to know, an outside expert's opinion would seem to amount to no more than the doctor or the bartender down the street in *Chapman*, who could offer little that was helpful to the requisite foreseeability involving what the local defendant knew or, by reason of local circumstances, should know. *See Belgarde v. Linn*, 205 Or App 433, 441-42, 134 P3d 1082, *rev den*, 341 Or 197 (2006) (affidavit under ORCP 47 E ineffective where inappropriate).

(2) the meaning and sufficiency of a national statistic. I do not disagree with the majority in a desire to see an innocent victim compensated for injury, to see anyone legally responsible held to task, and, by assuring a tort remedy, to encourage safeguards to avoid repetition of such an offense in the future. Yet, as to this local fraternity on this occasion, Oregon law should compel a different conclusion for these two reasons: (1) the party setting is "facilitation," not a basis for liability, and (2) the national statistic, upon which critical arguments are based, is misunderstood and is insufficient evidence.

### 1. *Facilitation Is Not Foreseeabilty*

The majority is not entirely misguided in recognizing the role of the setting. Kerr, the coordinator of "Greek Life" at Oregon State University, opined that it was his advice to fraternity presidents to close access to private rooms during social events with alcohol. In a private room, the sponsor's "control disappears." He said, "[T]he opportunity for there to be sexual misconduct rises because they're no longer in an area that is managed." Kerr's evidence was simply that it was "good practice to close [the] private rooms" to preclude the "opportunity" of sexual misconduct.

When asked if he had relayed his advice to the Beta chapter, Kerr said he did not recall. Over the last 10 years he "probably" had the conversation with a representative of each fraternity. If he talked to the Beta Chapter, it may not have been during the tenure of its current, student officers. Gerritz, the Beta president, testified he had not heard of a fraternity at OSU closing its private rooms during a party, although he had heard of sororities doing that. When Kerr was asked again if he had given his advice to the Beta Chapter, he concluded, "[T]hat I can't confirm." Ultimately, it does not matter whether Kerr's knowledge should be imputed to the Beta chapter, either as a matter of reasonable inference or as a matter of impermissible speculation. *See Chapman*, 263 Or App at 536 (describing the "intermediate inferences" as "guesswork"). Kerr's testimony was about "good practices" or preventative measures. His testimony was about the setting, not about the reasonable foreseeability of alcohol-related, third-party violence. Kerr

did not testify to relative likelihood of violence, the propensity for alcohol to lead to sexual assault, nor, so far as the record reflects, did he testify that a sexual assault had ever happened at an OSU party. *See id.* (rejecting inferences about defendant's knowledge to be made from the testimony of a doctor and a nearby bartender). For the critical fact about the foreseeability of assault, plaintiff's claim relies on the national statistic from the fraternity's guide—to be discussed next.

Construing the evidence most favorably to plaintiff, the fraternity may have "facilitated" the sexual assault by tacitly permitting a fraternity member to keep alcohol in his room and to invite a party guest there. However, facilitating a crime, even carelessly, does not suffice to impose financial liability for a third person's intentional act. *Buchler*, 316 Or at 510-11. We know from the series of cases like *Moore*, *Sparks*, and *Chapman* that actually serving a visibly intoxicated person does not give the alcohol provider reason to know "that the person would become violent." *See, e.g.*, *Chapman*, 263 Or App at 533. "Specific facts" about the person, which the server had reason to know, must be offered in order to create the possibility of liability.

We know from cases like *J. C. Penney* and *Stewart* that to provide a setting like a parking lot or a restroom, where the crime is easier to accomplish, is not enough to make a defendant liable for an unsafe location. And we know from *Buchler*, where leaving keys in the van hastened the escape, that carelessly facilitating a crime does not make that crime foreseeable by the defendant. Even when a defendant's act is within the chain of causation, that does not make the defendant responsible for another's intentional act. *Buchler's* observation bears repetition:

> "While it is generally foreseeable that criminals may commit crimes and that prisoners may escape and engage in criminal activity while at large, *that level of foreseeability does not make the criminal's acts the legal responsibility of everyone who may have contributed in some way to the criminal opportunity.*"

*Buchler*, 316 Or at 511 (emphasis added). Under Oregon law, the fraternity, at worst, did no more than "facilitate" this

crime by allowing Sako to have alcohol and a guest in his room. Without more, that is not enough to make the Beta Chapter financially responsible for sexual assault.

## 2. *A Statistic, Misunderstood and Insufficient*

The majority concludes that the Beta Chapter "knew that alcohol-related sexual assaults were a foreseeable risk of hosting social events where alcohol is available, and that permissive alcohol use by underage members and access to private rooms during such social events increases the risk of sexual misconduct." 273 Or App at 407. In part, the conclusion rests simply on the spectre of a Halloween party at a fraternity—a setting that, at best, amounts to "facilitation," not reasonable foreseeability. In part, the majority's conclusion is based on "computer-based programs," which include a topic on alcohol at social events and a topic on sexual assault, and on the Risk Management and Insurance Guide (guide), provided by the national fraternity. The content of the online training, however, is not in this record, and to assume its content is a speculative inference. If we could reasonably assume that the online training contains information akin to the guide, then that online training would tell a fraternity no more than what the guide does, and that is not enough with which to make a reasonable inference. The guide *is* in the record and warrants scrutiny. It is the document that provides the national statistic on alcohol-related sexual assault that is the heart of plaintiff's case and the majority's conclusion.

The national statistic on alcohol-related sexual assault, offered in this case, is not the same as plaintiff's *argument* about it. When properly understood, this incomplete and generalized statistic is not a substitute for the requisite, specific evidence of experience at this location. In its summary of facts, plaintiff's brief takes the liberty to argue that the national fraternity's guide purportedly shows "both defendants' knowledge of the *epidemic* of sexual assault and alcohol abuse at fraternities" in this nation. (Emphasis added.) The majority opinion succumbs to this tempting spin on a misconstrued statistic. In its analysis, the majority finds that plaintiff offered evidence "that the chapter knew that alcohol-related sexual assaults were a

risk in certain circumstances at fraternities on college campuses nationwide." 273 Or App at 411; *see also id.* at 408 ("potential problem" and "increased the risk of sexual misconduct"). In truth, the evidence in this record is much less than plaintiff's interpretive spin. It is critically incomplete.

The guide underscores the importance of its recommended precautions, like the measures used at this party, with an introduction on "social programming and alcohol." It recounts:

> "In the last decade, over 700 Greek-related accidents and injuries were reported. In many, insurance claims and/or legal action resulted. Of the most serious incidents, alcohol was a factor in 96% of falls from roofs, 97% of sexual abuse, 96% of fights and 87% of automobile accidents."

In a later section on sexual assault, the guide advises:

> "As with so many problems on college campuses, alcohol plays a prevalent role in sexual assaults. Many campus rapes involve alcohol or, in some cases, drugs. One report estimates that 50% of the women who fall victim to rape attempts and 75% of their attackers have been drinking prior to the incidents. Of sexual abuse cases which have been brought against fraternities, 97% involved alcohol."

These statistics speak of alcohol within a subset of injuries. These statistics do not speak of the larger set of individual and social activities with alcohol. Context is missing. These statistics tell how often alcohol is involved when some circumstances eventuated in falls, fights, automobile accidents, and sexual assaults, but these statistics do not foretell how often alcohol consumption, by how many tens of thousands of fraternity members and guests at how many thousands of organized social events and unplanned individual interactions over 10 years, resulted in 700 accidents and injuries. To say that alcohol was consumed in 97 percent of incidents of sexual abuse does not mean that 97 percent of fraternity members who consume any alcohol will commit rape. The guide does not report how many sexual assaults occurred, let alone how often they occurred in comparison to how often fraternity members consumed alcohol alone or with an acquaintance, friend, guest, or date. Without knowing the proportion of sexual abuse in the larger field of all

activities, ranging from individual encounters to planned social events, the guide's incomplete statistic cannot rationally be used to foretell or to foresee that alcohol consumption portends rape.

The guide introduces the topic of sexual assaults, saying "alcohol plays a prevalent role in sexual assaults." It follows with the 97 percent statistic. In context, the term "prevalent role" refers to the statistic on the frequency of alcohol within the subset of injuries. The term does not mean that any alcohol consumption leads foreseeably to rape. Again, without knowing how often alcohol is consumed, it begs the question to say that alcohol use is "prevalent" in a high number of assaults.

In its section on "social programming and alcohol," the guide does address the effects of alcohol, indicating:

> "Alcohol is a depressant. It slows down your bodily functions and the ability to respond. It does not increase the sex drive, but will decrease your inhibitions."

Although decreased inhibition suggests misjudgments, the statement still does not foretell the frequency of sexual assault in the larger context of all alcohol consumption. It is a statement, much too generalized, and insufficient to make a fraternity reader, who left alcohol in the possession of another fraternity member, legally liable for another member's rape of a victim. *See Chapman*, 263 Or App at 532-33 (doctor's testimony that "[i]ntoxicated drinkers frequently become violent" did not suffice to show server knew the same and had specific reason to foresee violence).

To be sure, no evidence in *this* record says that there is an "epidemic" of sexual abuse. The raw numbers and the proportions are not here. Nor is there any evidence in this record that alcohol-related sexual assaults were prevalent in fraternities on college campuses nationwide. To say so is to misconstrue the guide's statistic. To say so is to speculate. To say so is to make an inference that is not rational or reasonable. *See Chapman*, 263 Or App at 536 (too many "intermediate inferences represent guesswork").

The misuse of the guide's statistic is easier to recognize if the same rationale is applied to the companion statistic that 87 percent of automobile accidents were alcohol related. Here again, we do not know how many thousands of fraternity gatherings or individual encounters included the consumption of alcohol. We should know that we are not permitted to speculate how many instances of alcohol consumption eventuate in how many vehicle accidents. We should know that the 87 percent figure cannot mean that a local fraternity should foresee and become liable, without more, for any alcohol-related collision involving a fraternity member. But, plaintiff's statistical rationale would mean that, if a fraternity member was allowed to possess alcohol in his room and, if a guest had suffered injuries on a ride home with a fraternity member in an alcohol-related accident, then the fraternity would be held liable. Plaintiff's statistical rationale, which the majority necessarily assumes, would hold the fraternity liable although the fraternity had not provided him alcohol while visibly intoxicated, nor even provided him any alcohol at all. It would suffice that he was allowed to possess his own alcohol.

Liability for a third person's intentional violence should not be easier to prove than liability for a third person's drunk driving. Oregon cases have established that the risk of violence is not reasonably foreseeable simply from having served someone who is visibly intoxicated. *See, e.g., Moore*, 307 Or at 260-61; *Chapman*, 263 Or App at 531; *Sparks*, 122 Or App at 139-40. Logically, therefore, to hold a defendant liable for a third person's deliberate violence, purportedly because defendant allowed the third person to *possess* alcohol, should not be even easier than to hold a defendant liable for another's violence when defendant *served* a visibly intoxicated, third person. Because the fraternity could not be held liable for deliberate violence if it had served Sako while visibly intoxicated, it is difficult to understand how the fraternity could be liable for his assault when having allowed him to consume his own alcohol.

Even if plaintiff's statistic were what it is not—a national statistic on the frequency of sexual assault among all occasions of alcohol consumption—it would only be the

same sort of evidence that *Buchler* rejected as a reason to foresee injury by a third party. In *Buchler*, it might have been plausible to fear that an escaped prisoner would use violence in order to remain free. Yet, the Supreme Court declared that the generalized idea that crime may occur when a criminal is at large does not suffice to give a defendant, even someone who may have contributed to the escape, reason to foresee violence from subsequent crime by a previously nonviolent offender. 316 Or at 511.

The Beta Chapter correctly contended that plaintiff's reliance on a national statistic was too generalized to give it reason to have foreseen a crime which had no precedent in Sako's past or in the group's experience. We should remember from the cases on unsafe locations that "specific facts" showing a risk of crime at or near this location was necessary to show that a defendant had reason to foresee harm to plaintiff from an unexpected, third person. *Uihlein*, 282 Or 631 (summary judgment for lack of local evidence); *Piazza*, 271 Or App 490 (specific facts of location's experience permitted claim for failure to protect patron); *Stewart*, 245 Or App 267 (dismissal for failure to state a claim based on general criminal risk to teen carwash). The misconstrued and incomplete statistic, which is the heart of plaintiff's claim to foreseeability, is not "the specific factual support," based on Sako's behavior or the location's experience, that Oregon law requires to have given the Beta Chapter reason to foresee and become liable for the intentional offense of a third person.

## III. CONCLUSION

I concur that the claim based on negligence *per se* cannot be dismissed for the reasons defendant had urged, but I cannot concur that the law permits a claim of ordinary negligence against the local fraternity. The offense is reprehensible, but on *this* record and on the negligence claim, the circle of blame for another's crime should not go further than the offender. Therefore, I reluctantly dissent.